1  MR. ANTHONY E. JOHNSON /K-00950
2  CSP- SACRAMENTO
3  P.O. BOX 290066
   REPRESA CA. 95671-00066

4
5
6
7  JOHNSON
8  -VS-
9  TONY MALFI (A)
   WARDEN,
10 BILL LOCKYER,
11 ATTORNEY GENERAL

**FILED**

MAY 16 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

06-5539
12  CASE NO. C-06-6376-MJJ
13  TRAVERSE TO SHOW
       CAUSE
14
15          DATE : 5 /12 /08
16
17          UNITED STATE DISTRICT COURT
18          NORTHERN DISTRICT OF CALIFORNIA
19
20          supplemental
21          TRAVERSE
22
23  PLEASE TAKE NOTICE : TO SHOW CAUSE
24  FIRST AND FORMOST, WITH ALL DUE RESPECT, I
    WOULD LIKE TO PRESENT TO YOU VITAL AND
25  ACCURATE TRANSCRIPTS THAT HIGHLY PERT*
    TO MY DEFENSE AND WHY ALL OF MY CLAIMS
26  SHOULD BE REVERSED.
    AS YOU WOULD SEE, I PERSENTED EXHIBITS
27  A- THRU- B THESE ARE MY LEGAL CLAIMS
28 (1) THE TRIAL COURT VIOLATED MY RIGHT.
    TO DUE PROCESS AND TO PRESENT A DEFENSE

(1)

docket as supplement/ per Ginc

1  IN DENYING PETITIONER'S REQUEST TO CALL
2  A WITNESS TO THE STAND AND TO INSTRUCT
   THE JURY THAT IT COULD DRAW NEGATIVE
3  INFERENCE FROM THE WITNESS'S
   REFUSAL TO TESTIFY;
4  (2) THE TRIAL COURT. VIOLATED PETITIONER'S
5  RIGHT TO PRESENT A DEFENSE AND TO A
6  FAIR TRIAL BY THE CUMULATIVE EFFECT
   OF THE FOREGOING ERROR AND REFUSING
7  TO INSTRUCT THE JURY ON ENTRAPMENT.

8

9

10      (SIGNATURE) Mr. Anthony E. Johnson
            MR. ANTHONY E. JOHNSON
11          SUMMITTED

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(2)

1

2 1) THE TRIAL COURT ERRONEOUSLY REFUSED

3 APPELLANT'S REQUEST TO CALL MARVIN JACKSON

4 TO THE STAND BEFORE THE JURY AND FOR

4 THE JURY TO BE PERMITTED TO DRAW

5 NEGATIVE INFERENCES FROM JACKSON'S

6 UNLAWFUL REFUSAL TO TESTIFY,

6 REQUIRING REVERSAL OF THE JUDGMENT.

7

8 · · · · · · · · · · · · · · · · 8

9

10 2) THE CUMULATIVE EFFECT OF THE TRIAL

11 COURT'S REFUSAL TO INSTRUCT ON

12 ENTRAPMENT AND FAILURE TO PERMIT

13 APPELLANT TO CALL MARVIN JACKSON TO

13 THE STAND DEPRIVED APPELLANT OF HIS

14 RIGHTS UNDER THE SIXTH AND

15 FOURTEENTH AMENDMENT TO PRESENT A

15 DEFENSE AND A FAIR TRIAL.

16

17 · · · · · · · · 16

18

19

20

21

22

23

24

25

26

27

28

*People v. Guiton* (1993) 4 Cal.4th 1116 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*People v. Harris* (1998) 60 Cal.App.4th 727 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*People v. James* (2000) 81 Cal.App.4th 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*People v. Lopez* (1999) 71 Cal.App.4th 1550 . . . . . . . . . . . . . . . . . . . . 12, , 13 , , 15

*People v. Mayberry* (1975) 15 Cal.3d 143 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*People v. Mills* (1978) 81 Cal.App.3d 171 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*People v. Reliford* (2003) 29 Cal.4th 1007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*People v. Ryner* (1985) 164 Cal.App.3d 1075 . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*People v. Thompson* (1980) 27 Cal.3d 303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*People v. Watson* (2000) 22 Cal.4th 220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*People v. Williams* (1971) 22 Cal.App.3d 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*People v. Zapien* (1993) 4 Cal.4th 929 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Roberts v. United States* (1980) 445 U.S. 552 . . . . . . . . . . . . . . . . . . . . . . . . . 12

*San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1 . . . . . . . . . . . . . . . . .

*Shapiro* v. *Thompson* (1969) 394 U.S. 618 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Shepard v. United States* (2005) __ U.S. __ [125 S.Ct. 1254] . . . . . . . . . . . . . . . .

*Sherman v. United States* (1958) 356 U.S. 369 . . . . . . . . . . . . . . . . . . . . . . . . . .

*Snyder v. Massachusetts* (1933) 291 U.S. 97 . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Speiser v. Randall* (1958) 357 U.S. 513 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Spencer v. Texas* (1967) 385 U.S. 554 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Stromberg v. California* (1931) 283 U.S. 359 . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                    **<u>Page(s)</u>**

*Almendarez-Torres v. United States* (1998) 523 U.S. 224 . . . . . . . . . . . . . . . . . . . .

*Apprendi v. New Jersey* (2000) 530 U.S. 466 . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Attorney General of New York v. Soto-Lopez* (1986) 476 U.S. 898 . . . . . . . . . . . . .

*Blakely v. Washington* (2004) 524 U.S. 296 . . . . . . . . . . .

*California v. Trombetta* (1984) 467 U.S. 479 . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Chapman v. California* (1967) 386 U.S. 18 . . . . . . . . . . . . . . . . . . . . . . .

*Conde v. Henry* (9th Cir. 1999) 198 F.3d 734 . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Crane v. Kentucky* (1986) 476 U.S. 683 . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Darden v. McNeel* (5th Cir. 1992) 978 F.2d 1453 . . . . . . . . . . . . . . . . . . . . . 16

*Griffin v. United States* (1991) 502 U.S. 46 . . . . . . . . . . . . . . . . . . . . . . . . . .

*In re Marriage of Sachs* (2002) 95 Cal.App.4th 1144 . . . . . . . . . . . . . . . . . 15

*In re Neely* (1993) 6 Cal.4th 901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*In re Winship* (1970) 397 U.S. 358 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Marchetti v. United States* (1968) 390 U.S. 39 . . . . . . . . . . . . . . . . . . . 12, , , 14

*McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378 . . . . . . . . . . . . . . . . . . . . . . .

*Namet v. United States* (1963) 373 U.S. 179 . . . . . . . . . . . . . . . . . . . . . . . 15

*Panzavecchia v. Wainwright* (5th Cir. 1981) 658 F.2d 337 . . . . . . . . . . . . . . . . . .

*People v. Engelman* (2002) 28 Cal.4th 436 . . . . . . . . . . . . . . . . . . . . . 17 , ,

*People v. Falsetta* (1999) 21 Cal.4th 903 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Sullivan v. Louisiana* (1993) 508 U.S. 275 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Taylor v. Kentucky* (1978) 436 U.S. 478 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Taylor v. United States* (1988) 484 U.S. 400 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Booker* (2005) 543 U.S. 220 . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Castro* (1st Cir. 1998) 129 F.3d 226 . . . . . . . . . . . . . . . . 11, , 14 15

*United States v. Gaudin* (1995) 515 U.S. 506 . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Gomez-Rojas* (5th Cir. 1975) 507 F.2d 1213 . . . . . . . . . . . . . . . . . 8

*United States v. Rylander* (1983) 460 U.S. 752 . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Salerno* (1987) 481 U.S. 739 . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Yates v. Evatt* (1991) 500 U.S. 391 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .


**Statutes & Other Authorities**

Cal. Rules of Court, rule 4.420 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Cal. Rules of Court, rule 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Cal. Rules of Court, rule 28.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Evid. Code, § 352 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Evid. Code, § 913 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Evid. Code, § 940 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Evid. Code, § 1108 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5, 6, 8, 9

Pen. Code, § 1170 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**VI.   THE TRIAL COURT ERRONEOUSLY REFUSED
APPELLANT'S REQUEST TO CALL MARVIN JACKSON
TO THE STAND BEFORE THE JURY AND FOR THE JURY
TO BE PERMITTED TO DRAW NEGATIVE INFERENCES
FROM JACKSON'S UNLAWFUL REFUSAL TO TESTIFY,
REQUIRING REVERSAL OF THE JUDGMENT.**

The Court of Appeal's suggestion that Marvin Jackson may have had a

legitimate Fifth Amendment right to refuse to testify in this case is wrong,

and its holding that any error was nevertheless harmless, is untenable. (Slip

op., pp. 18-21.) To establish his defense of entrapment, appellant sought to

call Marvin Jackson as his witness. (RT 1131-1132.) Specifically, appellant

wanted to elicit testimony from Jackson about pressuring appellant and acting

as an agent of the police.[5] (RT 1406-1407, 1413-1415.) However, just

before the commencement of the defense case, Jackson's attorney apprised

the trial court, out of the presence of the jury, of Jackson's intention not to

testify under any condition. Jackson's attorney further explained that

Jackson's refusal to testify would expose Jackson to contempt charges, and

that as a result, Jackson's attorney had advised Jackson to invoke his Fifth

---

[5] Throughout the case, the defense consistently maintained that it knew
Jackson was the informant and that requesting the prosecutor to disclose
his identity would be pointless. (See Augmented Reporter's Transcript
[ART] [November 20, 2002] 33-35, 37-40; RT 1046, 1049, 1126; see
*United States v. Gomez-Rojas* (5th Cir. 1975) 507 F.2d 1213, 1219 ["a
defendant who claims entrapment cannot help but admit that he knows
the identity of the informer"].)

Amendment privilege against self-incrimination. (RT 1440, 1443.)

Jackson's attorney, Mr. Risse, acknowledged that the possibility of

exposing himself to contempt charges by refusing to testify was *the only*

reason behind Jackson's anticipated invocation of the Fifth Amendment.

(RT 1444.)

Jackson was then called to the stand outside the presence of the jury.

(RT 1444-1445.) As expected, Jackson refused to answer any questions, and,

when asked the legal basis for his refusal, Jackson asserted his privilege

against self-incrimination. (RT 1445.) The trial court advised Jackson that it

did not believe Jackson had "any penal interest to be protected," and ordered

Jackson to answer the question put to him by appellant's trial counsel.[6] (RT

1446.) After conferring with his attorney, Jackson again refused to answer

the question on grounds that it might incriminate him. The trial court asked

Jackson, "And the incrimination being you're concerned that this court will

hold you in contempt of court?," to which Jackson responded, "Yes." (*Ibid.*)

---

[6] The very first question put to Jackson was, "Mr. Jackson, do you know
or have you ever met my client Anthony Johnson?" (RT 1445.) Jackson
replied, "I won't answer that question." The trial court then asked why
he would not answer the question, and Jackson replied, "I refuse to
testify, your Honor." (*Ibid.*)

The parties below argued over whether Jackson had a legitimate right under the Fifth Amendment to refuse to testify. (RT 1446-1449.) Appellant's trial counsel argued that Jackson's refusal to testify was not protected by the privilege against self-incrimination, and asked the court to make a finding to this effect on the record. (RT 1447-1449.) Jackson's attorney, on the other hand, continued to maintain that his client's actions were constitutionally justified: "I mean, if he tells the court he's not going to testify, he can be held in contempt of court. So that's why he wants to protect himself." (RT 1448.)

The trial court again asked Jackson whether he was going to answer any of defense counsel's questions. When Jackson responded that he was not, the trial court stated, "I think that concludes the matter," and deferred taking any action on the contempt matter until after trial. (RT 1449.)

Neither Jackson nor his attorney ever indicated, or even suggested, that Jackson's assertion of the privilege had any relationship whatsoever to his fear of being prosecuted for threatening appellant with death.

The legitimacy of Jackson's refusal to testify was brought up again the next day. Appellant's trial counsel requested that Jackson be called to the stand in front of the jury, and that if he refused to testify under court order, that the jury be permitted to draw negative inferences from his refusal. (RT



1606-1608.) In response to the prosecutor's argument that it is never permissible for the jury to learn that a witness is invoking the Fifth Amendment, appellant's trial counsel explained that in a case like this one, where the witness does not have a valid Fifth Amendment right to assert, this prohibition does not apply. (RT 1606-1614.) While noting that this case presented "a novel issue in some ways," the trial court ruled that it would be inappropriate to have Jackson invoke the Fifth Amendment in the presence of the jury. (RT 1614.)

As implicitly noted in the opinion of the Court of Appeal, the trial court was wrong. The Fifth Amendment to the United States Constitution declares in part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." (See also Evid. Code, § 940 ["a person has a privilege to refuse to disclose any matter that may tend to incriminate him"].) "[T]he Fifth Amendment's prophylaxis is not available to all comers in all circumstances merely because they have the presence of mind to chant the accepted constitutional liturgy. To the contrary, the prospective witness must show at the very least that he is faced with some authentic danger of incrimination." (*United States v. Castro* (1st Cir. 1998) 129 F.3d 226, 229.)

The trial court has a duty to determine the legitimacy of a witness's reliance upon the Fifth Amendment. (*Hoffman v. United States* (1951) 341

U.S. 479, 486; *People v. Lopez* (1999) 71 Cal.App.4th 1550, 1554-1556,

citing *Roberts v. United States* (1980) 445 U.S. 552, 560, fn. 7.)  A court

passing on a claim of Fifth Amendment privilege must determine whether the

claimant is faced with "substantial and 'real,' and not merely trifling or

imaginary hazards of incrimination." (*Marchetti v. United States* (1968) 390

U.S. 39, 53.)  The mere "say-so" of the claimant "does not of itself establish

the hazard . . . ." (*Hoffman v. United States, supra,* 341 U.S. at p. 486.)

    If a trial court determines that a witness can validly invoke the Fifth

Amendment privilege against self-incrimination, it is error to force the

witness to invoke the privilege in front of the jury because "such a procedure

encourages inappropriate speculation on the part of jurors about the reasons

for the invocation." (*People v. Lopez, supra,* 71 Cal.App.4th at p. 1554.)

However, when a witness has no constitutional right to refuse to testify,

"jurors are entitled to draw a negative inference when such a witness refuses

to provide relevant testimony." (*Ibid.,* italics omitted.)

    In *Lopez, supra,* a witness indicated out of the presence of the jury that

he would refuse to testify.  The witness did not have a valid privilege against

self-incrimination because he had already entered a plea to the offense and

because the time for an appeal had passed.  When called to the stand, the

witness invoked the privilege and refused to answer questions in front of the

jury. The appellate court held that the procedure followed was proper. It decided that when a trial court has determined out of the presence of the jury that a witness's privilege has been waived or no longer exists, the jury is entitled to hear the witness's improper claim of privilege and may draw a negative inference when the witness refuses to answer questions.

> Once a court determines a witness has a valid Fifth Amendment right not to testify, it is, of course, improper to require him to invoke the privilege in front of a jury; such a procedure encourages inappropriate speculation on the part of jurors about the reasons for the invocation. An adverse inference, damaging to the defense, may be drawn by jurors despite the possibility the assertion of privilege may be based upon reasons unrelated to guilt. These points are well established by existing case law. (See, e.g., *People v. Mincey* [(1992)] 2 Cal.4th [408,] 441.) But where a witness has no constitutional or statutory right to refuse to testify, a different analysis applies. Jurors are *entitled* to draw a negative inference when such a witness refuses to provide relevant testimony.

(*People v. Lopez, supra*, 71 Cal.App.4th at p. 1554, original italics.)

In the present case, Jackson did not have a valid privilege to claim. The notion that a witness can instantly manufacture a Fifth Amendment claim by simply refusing to testify, is absurd. Allowing a witness to withhold testimony on this ground would impermissibly "convert the privilege from the shield against compulsory self-incrimination which it was intended" into a "sword whereby a claimant asserting the privilege would be freed from adducing proof" anytime he simply did not want to testify. (*United States v. Rylander* (1983) 460 U.S. 752, 758.) As the United States Supreme Court

has observed, "A witness may not employ the privilege to avoid giving testimony that he would simply prefer not to give." (*Roberts v. United States* (1980) 445 U.S. 552, 560, fn. 7.)  This is exactly what Jackson did here. As appellant's trial counsel argued at length below, it was only by *not* testifying that Jackson faced possible contempt charges. (RT 1446-1448, 1606-1608, 1612-1614.)  The Fifth Amendment, however, protects witnesses from being forced to *give* incriminating testimony. (*Hoffman v. United States, supra,* 341 U.S. at p. 486 [Fifth Amendment is a "guarantee against testimonial compulsion"].)  In this case, Jackson attempted to turn that principle on its head.

As both Jackson and his attorney (Mr. Risse) candidly admitted, the *only* danger of incrimination here was the possibility of being held in contempt for refusing to testify. (RT 1444, 1446.)  The Court of Appeal's suggestion that Jackson may have had a valid basis for asserting the privilege against self-incrimination if he testified that he had threatened appellant with death, is inconsistent with Jackson's own position in the trial court, and is completely speculative.  (See *United States v. Castro, supra,* 129 F.3d at p. 229; see also *Marchetti v. United States* (1968) 390 U.S. 39, 53.)  Moreover, the record on appeal indicates that the trial court did not believe Jackson had a valid privilege against self-incrimination (RT 1446), and this finding is

entitled to deference on appeal. (*In re Marriage of Sachs* (2002) 95 Cal.App.4th 1144, 1151 [appellate court reviews the trial court's determination as to legitimacy of a witness's reliance upon the Fifth Amendment is reviewed under the abuse of discretion standard]; *United States v. Castro, supra*, 129 F.3d at p. 229 [same].)

Because Jackson did not have a valid privilege against self-incrimination, Evidence Code section 913, which prohibits comment upon the exercise of a privilege and prohibits the drawing of adverse inferences from that exercise, was inapplicable. Accordingly, as in *People v. Lopez, supra,* 71 Cal.App.4th at page 1555, appellant was entitled to call Jackson to the stand in front of the jury, and the jury was entitled to draw a negative inference when Jackson refused to testify. The error deprived appellant of his constitutional right under the Sixth and Fourteenth Amendments to present a complete defense. (See *Crane v. Kentucky* (1986) 476 U.S. 683, 690 ; *Taylor v. United States* (1988) 484 U.S. 400, 408-409.) Moreover, it cannot be said that the error was harmless. (See *Namet v. United States* (1963) 373 U.S. 179, 189 [employing harmless error analysis].) Jackson was perhaps the only person who could corroborate appellant's version of the events, and his refusal to testify would undoubtedly have bolstered appellant's credibility before the jury. If the jury had the opportunity to see and hear Jackson

(14)

violate the court's order and refuse to testify, it cannot be said beyond a

reasonable doubt that it would not have believed appellant's testimony that an

inmate named Marvin Jackson had improperly pressured him into the plan to

kill Patti, nor can it be said that the trial court would have denied appellant's

request for an entrapment instruction. (*Sullivan v. Louisiana* (1993) 508 U.S.

275, 279.) This Court should grant review and reverse.

**VII.   THE CUMULATIVE EFFECT OF THE TRIAL COURT'S
REFUSAL TO INSTRUCT ON ENTRAPMENT AND FAILURE
TO PERMIT APPELLANT TO CALL MARVIN JACKSON TO
THE STAND DEPRIVED APPELLANT OF HIS RIGHTS
UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO
PRESENT A DEFENSE AND A FAIR TRIAL.**

The courts of this state recognize their obligation to assess the

cumulative effect of errors on a criminal conviction. (See, e.g., *People v.

Ryner* (1985) 164 Cal.App.3d 1075, 1087; *People v. Williams* (1971) 22

Cal.App.3d 34, 40, 58.) Moreover, the cumulative effect of errors may

operate to deprive a defendant of due process and a fair trial, requiring

reversal irrespective of any lack of objections on the part of defendant. (See

*Taylor v. Kentucky* (1978) 436 U.S. 478, 486-490; *Darden v. McNeel* (5th

Cir. 1992) 978 F.2d 1453, 1456; *People v. Mills* (1978) 81 Cal.App.3d 171,

176.) In the present case, the cumulative effect of the errors discussed in the

two previous arguments – the failure to instruct on appellant's theory of the

case, the limitation on defense counsel's closing argument, the limitation on

appellant's access to discovery relating to his theory of entrapment, the

refusal to permit appellant to call Jackson to the stand in front of the jury, and

the refusal to allow the jury to learn of and draw negative inferences from

Jackson's refusal to testify – systematically deprived appellant of his Sixth

and Fourteenth Amendments right to present a defense, due process of law,

and a fair trial, and require reversal of the judgment.

# EXHIBIT COVER PAGE A

EXHIBIT

Description of this Exhibit: THE TRIAL COURT VIOLATED HIS
RIGHT TO DUE PROCESS AND TO PRESENT A DEFENSE
IN DENYING PETITIONER'S REQUEST TO CALL A
WITNESS TO THE STAND AND TO INSTRUCT THE
JURY THAT IT COULD DRAW NEGATIVE INFERENCES
FROM THE WITNESS'S REFUSAL TO TESTIFY

Number of pages to this Exhibit: 21 pages.

JURISDICTION: (Check only one)

- [ ] Municipal Court
- [ ] Superior Court
- [ ] Appellate Court
- [ ] State Supreme Court
- [x] United States District Court
- [ ] State Circuit Court
- [ ] United States Supreme Court
- [ ] Grand Jury

December 9, 2004

1  then where that takes us, I don't know.  But why don't we
2  start it with --
3      MR. HERNANDEZ:  And we have no objection to him taking
4  the oath right where he sits, your Honor, but we'll ask that
5  he be placed under oath.
6      THE COURT:  Mr. Jackson, could you stand up and be
7  sworn.
8      Madam Clerk?
9      THE CLERK:  Would you raise your right hand.
10                    **MARVIN JACKSON**,
11   called as a witness on behalf of the defendant, having been
12          first duly sworn, testified as follows:
13     THE CLERK:  Please state your name, spelling your last
14  name for the record.
15     THE WITNESS:  Marvin Jackson, J-A-C-K-S-O-N.
16     THE COURT:  Mr. Hernandez?
17                  **DIRECT EXAMINATION**
18     MR. HERNANDEZ:  Q.  Mr. Jackson, do you know or have you
19  ever met my client Anthony Johnson?
20     (Witness confers with Mr. Risse.)
21     THE WITNESS:  I won't answer that question.
22     THE COURT:  Why will you not answer that question?
23     (Witness confers with Mr. Risse.)
24     THE WITNESS:  I refuse to testify, your Honor.
25     THE COURT:  And the legal basis for your refusal?
26     (Witness confers with Mr. Risse.)
27     THE WITNESS:  I might incriminate myself.  I don't --
28  I'm not going to testify.

December 9, 2004

1       THE COURT: The court will order you to answer that

2    question. I don't believe you have a Fifth Amendment -- you

3    have any penal interest to be protected. Therefore, this

4    court orders you to answer that question.

5       (Witness confers with Mr. Risse.)

6       THE WITNESS: And I refuse to answer that question on

7    grounds that it may incriminate me.

8       THE COURT: And the incrimination being you're concerned

9    that this court will hold you in contempt of court?

10       THE WITNESS: Yes.

11       MR. HERNANDEZ: And, your Honor --

12       MS. COOK: Your Honor --

13       MR. HERNANDEZ: -- if I might, he's only in contempt if

14    he doesn't order -- if he doesn't answer. If he answers, he's

15    not in violation. So we've got it twisted around. He can

16    only incriminate himself at this point if he refuses to

17    answer. If he answers truthfully, or at least as he believes

18    to be truthfully, then he is not incriminating himself by

19    answering the question. It's exactly the opposite.

20       THE COURT: He has indicated he will not answer the

21    question.

22       MR. HERNANDEZ: On the grounds that it tends to

23    incriminate him.

24       THE COURT: Right.

25       MR. HERNANDEZ: I just want the record clear that the

26    only way he's incriminated is if he does not answer. So the

27    court has made an order that -- and I think I recall you made

28    an order -- that he do answer.

December 9, 2004

1    MS. COOK:  The court made an order.  My understanding is
2    the court made an order that he testify.  He refused to
3    testify.  He could therefore be held in contempt.  He's
4    refused to testify on the basis he would incriminate himself.
5    At least as far as I read the code, immunity may only be
6    requested by prosecutors in felony cases.  The defense can
7    initiate a request for immunity for a co-defendant under a
8    separate Penal Code section, but it doesn't say --
9    THE COURT:  I do not know that this court has the
10   ability to give immunity.
11   MR. HERNANDEZ:  Your Honor, I'm suggesting that he
12   doesn't need immunity because it's not testifying that
13   subjects him to criminal sanctions.  So the court doesn't have
14   to grant immunity.  So at this point, I'd like a finding on
15   the record that there are -- that his testimony does not
16   impugn his Fifth Amendment right, at least as asserted by
17   Mr. Risse, because Mr. Risse says that his Fifth Amendment
18   right is at risk if he testifies, because he'll be found in
19   contempt.  That's exactly the opposite.  His Fifth
20   Amendment -- I mean his right not to be incriminated is
21   impugned if he doesn't testify.  Because this court has said
22   you must testify.  If he testifies, then there's no way he is
23   violating this court's order, and he cannot be found in
24   contempt.
25   So I guess what I'm asking, your Honor, is that a
26   finding be made that his refusal to testify is not appropriate
27   under the Fifth Amendment.  I'm not asking the court to grant
28   immunity.  I'm asking this court to tell this gentleman that,

December 9, 2004

1  look, I've ordered you to testify.  You only are in contempt
2  if you don't testify.
3     MR. RISSE:  And he's told the court he's not testifying.
4     THE COURT:  That's what court heard.
5     MR. HERNANDEZ:  Right.  But it's not -- I want a finding
6  on the record that this court is finding that he is not
7  protected by the Fifth Amendment in doing so.
8     MS. COOK:  That's not appropriate, your Honor.
9     MR. RISSE:  I disagree.  I mean, if he tells the court
10  he's not going to testify, he can be held in contempt of
11  court.  And that's a crime.  So that's why he wants to protect
12  himself.
13     MR. HERNANDEZ:  He doesn't have to tell the court he's
14  not going to testify.  This court can look at this gentleman
15  and say, you must testify.  And then he has the right to
16  either remain silent -- well, he doesn't have the right.  He
17  can remain silent, and then contempt charges can be filed, or
18  he can speak and testify to what he's been asked.
19     And I guess what I'm saying, Judge, is I'm asking an
20  order that Mr. Hernandez' question must be answered, and the
21  only way you incriminate yourself is by remaining silent.
22  Because my understanding is how -- that's how he will
23  incriminate himself.  If he remains silent, he subjects
24  himself to contempt charges.  If he speaks, he doesn't subject
25  himself.
26     MR. RISSE:  I don't think that's necessarily the case.
27  When he tells the court that he's not going to testify, it's
28  the same thing as remaining silent.

December 9, 2004

1    THE COURT: Mr. Jackson, are you going to answer any

2    questions asked by Mr. Hernandez? This court has told you the

3    court orders you to answer this question. If you refuse to

4    answer the court's questions, the court could hold you in

5    contempt.

6    MR. RISSE: So does Mr. Hernandez want him to remain

7    totally silent and not say a word right now, or should he say

8    no?

9    MR. HERNANDEZ: Your Honor, I do agree with Mr. Risse.

10    His looking at this case and telling the court, I'm refusing

11    to answer the question. I ask the court to look at the man

12    and direct him: "A legal question has been posited to you. I

13    am directing you to answer it. You should understand you do

14    not have the Fifth Amendment right not to answer," and then

15    we'll see what happens.

16    MR. RISSE: I don't think that would be appropriate.

17    MR. HERNANDEZ: I'm not sure why, your Honor. This

18    court has the right to order him to answer.

19    THE COURT: I'm going to ask.

20    Mr. Jackson, are you going to be answering any questions

21    asked of you by Mr. Hernandez?

22    THE WITNESS: No, your Honor.

23    THE COURT: I think that concludes this matter.

24    MR. HERNANDEZ: We'll submit it.

25    THE COURT: I think the court, then, has the -- well,

26    the court will defer any hearing on a contempt issue at this

27    time until the conclusion of the trial.

28    All right. I think, then, we could have Mr. Jackson

December 9, 2004

1  taken back.

2      MR. HERNANDEZ:  Thank you, your Honor.

3      THE COURT:  All right.  Any further -- is there a motion

4  you wish to make now before the jury comes back?  I think you

5  deferred making a motion to help the court with our

6  scheduling, until now; right?

7      MR. HERNANDEZ:  Yes, your Honor.  Yes.

8      THE COURT:  All right.

9      MR. HERNANDEZ:  And -- I'd like to make an opening

10 statement, your Honor.  Again, it hadn't occurred to me.

11     THE COURT:  Outside the presence of the jury?

12     MR. HERNANDEZ:  No, I'm going to make an opening

13 statement.  My opening statement will be to the effect I

14 expect my client to testify.  I expect him to testify that he

15 had several contacts with Marvin Jackson and that that's who

16 set up this deal.  I'd like my opening statement to include

17 the rest of the testimony that I expect I legally would have

18 the right to show, and that is -- if I might give a preview --

19 and ladies and gentlemen, Detective Tosti will confirm that,

20 indeed, Marvin Jackson was the person who gave -- who became

21 the conduit.  Marvin Jackson was met with several times.

22     Again, I suggest that that is corroborative of my

23 client's testimony, and corroborative in two respects, your

24 Honor.  Corroborative in the sense that it will show that he's

25 telling the truth, that he met with Marvin Jackson several

26 times.  It will show that Marvin Jackson had some incentive to

27 get my client to do this, which my client is going to suggest

28 is part of this whole scheme.

December 9, 2004

1     And it also will corroborate the fact that Marvin
2  Jackson essentially was doing this without control or
3  monitoring by the Santa Rosa Police Department, which is
4  important because my client is going to say during this
5  period, Marvin Jackson was doing certain things.  Now, that is
6  direct testimony for the jury to decide whether they believe
7  it or not.
8     What I want is the Santa Rosa Police Department --
9  again, after Detective Badger said that generally,
10  investigations are not done that way, and suggested some of
11  the reasons they are not done that way.  I would like
12  Detective Tosti to testify, but in this situation it was --
13  and in this situation, in fact, it was Marvin Jackson who was
14  helping to perfect this investigation.
15     And again, I expect Officer Tosti to be honest.  I
16  believe him.  Officer Tosti did not direct any inappropriate
17  behavior.  But I expect him to testify that Marvin Jackson was
18  out of his control.  That Marvin Jackson was offered
19  consideration to do this, and for that reason, certainly, the
20  jury has the right to consider that, again, if and when my
21  client testifies.
22     Now, I put myself in jeopardy because if I say that in
23  my opening statement, then I look like a complete fool,
24  obviously, if my client doesn't testify and Tosti doesn't
25  either.  So that's how I would put myself in jeopardy.  But I
26  think we need to resolve that issue now because I think,
27  appropriately, it's part of my opening statement.
28     THE COURT:  The problem is that it -- the first

December 9, 2004

1  threshold of the appropriateness of that testimony is what

2  your client says.

3          MR. HERNANDEZ:  Yes.

4          THE COURT:  We don't know what he says.  So I don't

5  think we can, at this time, make any ruling on that.  If your

6  client -- based upon what your client testifies, this court

7  may or may not allow this testimony to come in.  But I have to

8  hear his testimony.  So I would not allow that in your opening

9  statement.

10         MR. HERNANDEZ:  Fine, your Honor.  Thank you.

11         THE COURT:  Anything else?

12         MR. HERNANDEZ:  I'd like to arrange to have

13  Detective Tosti available so that, again, we can move this

14  along should the need become necessary.  I mean, should the

15  need arise.

16         THE COURT:  Hopefully, that can be taken care of during

17  the lunch hour.

18         MS. COOK:  My investigator will work on that, your

19  Honor.

20         I would also point out while is it's fresh in our minds,

21  that Detective Tosti already testified that -- in a question

22  by Mr. Hernandez, Did you monitor, attempt to monitor in any

23  way contacts between my client and the informant during the

24  period that he was receiving information from the informant?

25  And Detective Tosti testified no.  And that under the

26  entrapment instructions, there is no way that disclosure of

27  the informant would further defense showing that the

28  confidential informant was acting under the direction,

December 9, 2004

1    suggestion, or control of law enforcement. And therefore, the

2    people will be asking the court to abide by its already-made

3    ruling that the identity of the informant not be disclosed.

4        I submit it.

5        MR. HERNANDEZ: Your Honor, we shifted the argument

6    here.

7        THE COURT: Let's defer that until we have testimony.

8    Once there is testimony, we'll take up that issue.

9        MS. COOK: I will be resting when I get back on the

10   record. I think all my exhibits have been entered in

11   evidence, if I could just ask Madam Clerk to check. With that

12   understanding, I will be resting. If there is an 1118 motion

13   that was mentioned in chambers, perhaps that could be made

14   now.

15       MR. HERNANDEZ: That's fine, your Honor.

16       THE COURT: Are all exhibits in?

17       THE CLERK: All but Exhibit 8, which are jail records.

18       MS. COOK: I will move to admit those. I thought we

19   stipulated to those.

20       THE COURT: Any objection to 8 coming in?

21       MR. HERNANDEZ: Eight was what?

22       MS. COOK: Jail records.

23       THE COURT: Eight's in evidence.

24       (Jail records marked People's Exhibit 8 for id. was

25   received in evid.)

26       THE COURT: Do you want to make your motion?

27       MR. HERNANDEZ: Yes, your Honor, 1118.

28       Regarding the solicitation, we're going to submit it on

December 9, 2004

 1 | the state of the evidence.  However, in terms of the
 2 | conspiracy, your Honor, we're going to suggest that for
 3 | several reasons, an 1118 is appropriate.  Most particularly,
 4 | your Honor, the people have offered as a witness and vouched
 5 | for the veracity of this witness, Catherine Johnson --
 6 | Catherine Johnson, your Honor, also known as Catherine
 7 | Petersen.
 8 |       The offer was made to this jury and to the court as
 9 | well, in agreements made outside the presence of the jury,
10 | that the agreement was that she would testify truthfully.  The
11 | people have offered unrebutted evidence that
12 | Cathy Petersen Johnson never harbored the specific intent to
13 | kill the victim, Patti, and it is an absolute necessary
14 | element of the crime of conspiracy that she have harbored that
15 | intent.  And again, it's not enough that she entered into a
16 | feigned agreement.  It's not enough that she tried to convince
17 | someone else that she was an active participant, in truth
18 | sought the end that was being described in that agreement.
19 | But it is an absolute requirement, as found in CALJIC, that in
20 | the case where there are only two co-conspirators that both
21 | co-conspirators must harbor specific intent to commit the
22 | crime.
23 |       And again, the people offered Ms. Johnson as an honest
24 | and truthful witness.  I'm assuming, given that her testimony
25 | was in no way inconsistent -- given that her testimony was in
26 | no way inconsistent with her taped interview with the
27 | Investigator Simerson, and the people -- and again, I'm
28 | certain if the court -- well, I don't know if the court sees

December 9, 2004

1   it as evidence -- it was in no way inconsistent that the

2   people offered exactly what they promised they would offer:  A

3   truthful witness.  They offered that witness for the reasons

4   that they suggested they offered that witness, and that

5   unrebutted, we have several problems, if this jury is allowed

6   to go ahead and find -- find my client guilty.

7        Number one, your Honor, it's unsupported by the

8   evidence, obviously.  Again, all the evidence offered by the

9   people is to the effect that that woman never had the intent

10  to kill, necessary for -- necessary for conspiracy.

11       Secondly, your Honor, I'm assuming that in several

12  weeks, the people will endorse their agreement with

13  Ms. Petersen and essentially say that the agreement should go

14  forward -- that is, that Ms. Petersen lived up to her

15  agreement to testify truthfully on behalf of the people, and

16  as such, the agreement made before this court and on the

17  record should go ahead.

18       I'm going to suggest that it would be untoward at this

19  point, if the people indeed intend to endorse their agreement,

20  that the agreement was premised on her testifying truthfully,

21  to find itself in a position, then, in several weeks, where

22  the people will indeed say this was a truthful -- this was

23  truthful testimony, then, and the deal should go through.  The

24  agreement should go through.

25       Then we're putting ourselves in the position -- and to

26  be perfectly frank, Judge, this court is putting itself in a

27  position where it will allow, unless the court, as they say,

28  nixed the deal -- the court will look at it and say justice is

December 9, 2004

```
 1   being done under 1192.5, on the conspiracy.  The agreement was
 2   she would testify honestly.  She testified honestly.  The
 3   court now -- I guess the people will ask the court put itself
 4   in the position of saying some weeks down the line, "It looks
 5   like Ms. Petersen told the truth.  We are going to abide by
 6   the agreement.  I'm not going to ask that it be withdrawn
 7   pursuant to 1192.5."  And yet find itself here today saying
 8   that Mr. Johnson could nonetheless be convicted on that same
 9   evidence.  Ms. Johnson was honest.  It is unrebutted.
10        At this point, at the close of the people's case, and
11   rather than this court engage in an inappropriate
12   inconsistency, if I might, your Honor, that is to allow the
13   jury to go ahead and try to convict him on evidence which the
14   people have vouched for as being truthful, which this court
15   will impliedly have to make a finding when it comes time for
16   sentencing, I'm going ask that the court dismiss the
17   conspiracy count.
18        I'm assuming the court, in looking at the conspiracy
19   section, found that, indeed, both must harbor the specific
20   intent to commit the target act.  As I indicate, Ms. Johnson
21   specifically and explicitly said she did not.
22        THE COURT:  Ms. Cook?
23        MS. COOK:  First of all, the people haven't vouched for
24   anything.  We've put a witness on the stand who's testified.
25   She's testified pursuant to a plea bargain.  The jury will
26   have all the instructions as to what and how we consider her
27   testimony.
28        Her self-serving statement in response to counsel's
```

1  leading question, "You didn't intend to kill Patti, did you?"

2  Is just that, a self-serving statement, one that walks the

3  gray line.  However, this is a witness who admitted and pled

4  to a charge of solicitation, which requires that very intent

5  to kill Patti.  Everything else she testified to on direct and

6  every other part of her testimony and the tapes and all the

7  other evidence in the case support the inference that she did

8  intend to kill Patti at the time of this agreement.  I don't

9  think I need to belabor that point.  That's an issue for the

10  jury.

11      Everything counsel argued as to what may or may not

12  happen at Cathy Petersen's sentencing is inappropriate for the

13  judge to consider just -- the jury will have a special

14  instruction that they are not to consider that.  I will be

15  making a motion in limine that counsel not mention that

16  argument in his opening or closing.  What happens at

17  Cathy Petersen's sentencing on that issue is not for this jury

18  to consider.  They are just to consider the plea bargain to

19  determine whether or not she was credible.

20      With that, I'd submit it.

21      MR. HERNANDEZ:  If I might, briefly, your Honor, I'm not

22  sure where -- what section the people would cite to suggest

23  that this court cannot consider it.  The court does have to

24  consider what it's engaged in and what it will engage in in

25  the future.  This court has become a party to the agreement

26  that this woman has testified truthfully in order to gain the

27  benefit of this agreement.  The court will necessarily and

28  impliedly do it under 1192.5 if it allows the agreement to go

December 9, 2004

```
 1   through.  And in doing so, the court heard the parameters:
 2   That is, she must testify truthfully.  If this court feels she
 3   lied, I guess at some point, the court has to say at some
 4   point, I'm not going to allow the deal to go through because
 5   the interests of justice are not served allowing her to lie
 6   here.
 7        I think it was completely consistent with the taped
 8   interview that we have in our possession because the people
 9   never pulled it out to impeach her.  I think that this court
10   has become a party, is and will be a party to it, and will
11   have to make that determination.
12        And for Ms. Cook to say here, why don't you wait to do
13   that later, that it's all right, Judge, if right now you let
14   this jury decide that she told a lie and allow Ms. Cook to
15   argue that she told a lie, but then in four to six weeks,
16   allow yourself to -- find yourself in a position where you're
17   going to say, well, I guess she told the truth.
18        This court is a party to this.  The court is being asked
19   to be a party to this, by the people, and I am unaware of any
20   authority that allows that the people can tell this court that
21   it can't consider what it's become a party to.
22        We'll submit it, your Honor.
23        THE COURT:  The court's listened to the comments of
24   counsel.  The court believes that there was sufficient
25   evidence to allow the Count II -- I think it is the
26   conspiracy -- to go to the jury and, therefore, will deny the
27   motion.
28        MR. HERNANDEZ:  Thank you, your Honor.
```

December 9, 2004

```
 1         THE COURT:  All right.  Anything else before we have the
 2    jurors come back in?
 3         MR. HERNANDEZ:  I don't --
 4         THE COURT:  And the people will rest first, I guess.
 5         MR. HERNANDEZ:  Yes.  I believe there was a proposed
 6    motion in limine.  I want to make sure I don't step aside of
 7    any -- well, the court's made no orders.
 8         THE COURT:  Other than in your -- the opening statement
 9    you now wish to make, as far as Officer Tosti, you're not
10    going to comment upon what he might say.
11         MR. HERNANDEZ:  That's one.  There was another
12    proposed -- I will not mention Detective Tosti.
13         MS. COOK:  It's not that counsel can mention plea
14    agreement; it's that what the people will do at her
15    sentencing.
16         MR. HERNANDEZ:  Oh.
17         MS. COOK:  I think that's inappropriate, your Honor.
18    The judge is getting a special instruction that they are not
19    to consider her plea bargain for any other purpose than her
20    credibility.
21         MR. HERNANDEZ:  And there, your Honor, again, certainly,
22    I'm not going to mention sentencing.  I'm going to suggest,
23    however, that it's not inappropriate for me to argue --
24    because at least on the face of it, she was offered as
25    somebody -- the deal you get is you testify honestly, you get
26    X deal.  I'm going to offer to the jury that, ladies and
27    gentlemen, she got the deal.  She testified honestly.
28         MS. COOK:  She hasn't gotten the deal yet.
```

December 9, 2004

1    MR. HERNANDEZ:  Now the people are talking about

2    sentencing, Judge.  So the people don't -- Ms. --

3    THE COURT:  Well, she hasn't -- we don't -- technically,

4    we don't know whether the people are going to honor the deal

5    or not.  She came into our courtroom, swore to tell the truth,

6    told -- and testified.  And I think both people -- both

7    counsel can comment upon her testimony and the fact that she

8    gave an oath.

9    MR. HERNANDEZ:  Well, no.  But, Judge, the people

10   mentioned -- that's where now the people are going to try to

11   close the door they've opened.  The people mentioned that she

12   did it pursuant to a plea agreement wherein she would only get

13   nine years, eight months.

14   THE COURT:  Right.

15   MR. HERNANDEZ:  So all I want to be able to argue is,

16   ladies and gentlemen, she was told, you tell the truth for

17   this deal.  Ladies and gentlemen, the evidence --"

18   THE COURT:  Tell the truth for the -- she was obligated

19   to tell the truth.

20   MR. HERNANDEZ:  For that deal.

21   THE COURT:  For that deal.

22   MR. HERNANDEZ:  That's all I intend to comment on, your

23   Honor.

24   MS. COOK:  Again, this is opening, what he anticipates

25   the evidence will show, not argument on my case already.

26   THE COURT:  Right.  Okay.  Anything else?

27   If we could have the prospective -- excuse me -- the

28   jurors brought back in.

December 9, 2004

1       MR. HERNANDEZ:  Your Honor, we shouldn't.  To be honest,

2   my client is in chains, and we're going to have to deal with

3   that if he's going to be my first witness.

4       THE COURT:  Is he going to testify?

5       MR. HERNANDEZ:  He is, your Honor.

6       THE COURT:  Why don't we right now move him up to the

7   witness chair so he can be there.

8       MS. COOK:  The matter of him being sworn, that we'll

9   have sitting?

10      THE COURT:  Well, we'll have him sitting up here also.

11      MR. HERNANDEZ:  I don't see any alternative, Judge.

12      THE COURT:  We need to move this chair down in order to

13  have that particular chair brought up here.

14      MS. COOK:  Should we approach real quick?  I have to ask

15  a question.

16      (Bench conference.)

17      THE COURT:  I've instructed our clerk to not ask your

18  client to stand and raise his right hand.  She will not ask

19  him to stand.

20      (Bench conference.)

21      THE COURT:  Are we now ready for the jury to come in?

22  Hearing nothing, please invite the jurors back in.

23      (Jury present.)

24      THE COURT:  All right.  The record may again reflect

25  jurors back in the jury box.  Defendant present, counsel

26  present.

27      Again, we seem to have a bad habit of only starting on

28  time when you least expect it.  So consistent with our

December 9, 2004

```
 1   inability to estimate time, we are starting late.  I again
 2   apologize.
 3        All right.  Ms. Cook?
 4        MS. COOK:  I'm sorry, your Honor.  At this time, the
 5   people will rest our case.
 6        THE COURT:  All right.  Mr. Hernandez?
 7        MR. HERNANDEZ:  Thank you, your Honor.
 8        THE COURT:  Do you wish to give an opening statement at
 9   this time?
10        MR. HERNANDEZ:  I do, your Honor.  Thank you.
11        Good morning, ladies and gentlemen.  I will be brief,
12   and I hope that in all parts we can be brief from here
13   forward.  I apologize for my part in making this longer than
14   certainly it should have been and hope you understand, when
15   it's all said and done, all of us do apologize.
16        Ladies and gentlemen, the defense case will be a brief
17   one.  When it's all finished, one issue that you're going to
18   need to consider, and this is how we expect the evidence will
19   play out and what the evidence will show you when it's all
20   said and done.  We'll ask you to integrate in your minds the
21   evidence that you've heard to what you're about to hear now.
22        First, you're going to hear my client, Anthony Johnson,
23   and he's going to testify.  And he's going to testify about
24   how essentially he came to be here before you, in terms of the
25   charges of solicitation and conspiracy to commit a murder.
26        The evidence is not going to suggest that it was some
27   other person who you heard on the tape.  The evidence is not
28   going to suggest that it was a misunderstanding, referring to
```

December 9, 2004

1    buying a car or something.  The conversations you heard -- and
2    that will be bolstered by the testimony you continue to
3    hear -- were in regards to a plan that involved the killing of
4    Patti.  No one -- the evidence is not going to suggest -- my
5    client or anyone else -- that it was right.
6        What we expect the evidence will show, however, is that
7    over the course of some time -- and again, after all this
8    time, it's a little unclear whether it was a week, ten days,
9    exactly -- and to an extent, you'll have to piece that
10   together from what you have and from what my client will tell
11   you about, to get the time line.  But what you're going to
12   have is evidence that at some point, a gentleman -- and my
13   client will identify him as Marvin Jackson, a person that my
14   client knows as M.J., approached him, offering to help out
15   with his predicament.  I think you may have heard that word
16   before from another witness.
17       At first, the offer of help was relatively ambiguous:
18   "I can help you with what's going on with your problem with
19   Patti."  You'll hear testimony that -- again, primarily from
20   my client -- that again, he wanted whatever help he could get,
21   as the charges facing him were quite serious, and he was
22   prepared to accept the help he could get.
23       Again, it's not clear what that help was:  An attorney,
24   some other unclear help with it, but it was not clear at first
25   to my client.
26       At some point, you will hear that it became clear that
27   Marvin Jackson made it clear what that was.  He told my client
28   that what he meant was you need to have this witness killed.

December 9, 2004

1   If this witness, if Patti, is not killed, then you're going to

2   go to prison.

3        In response to that, you'll hear evidence that no --

4   from my client -- no, I'm not going to go there.

5        So first contact, maybe second contact:  No, we're not

6   going to go there.

7        Again, it didn't happen right then, the evidence you'll

8   hear.  What you'll hear is my client tell you that he wanted

9   no part of it, but that the pressure didn't stop.  That one

10  contact had nothing to do with killing.  My client had no part

11  of it.  One or two more contacts, it's brought up.  Still no

12  part of it.

13       And through the course of contacts in the jail over that

14  time, several contacts, the pressure continued.

15       Ultimately, the pressure came to the point where my

16  client was assured that his life was in danger, truly in

17  danger:  That he would be killed if he ended up back in the

18  California State Prison.

19       And again, still, there was resistance.  Still there was

20  "I want no part of this."

21       And finally, again, over the course of some time -- a

22  week, ten days -- the pressure not stopping, the assurances of

23  the things, horrific things, that would befall him -- you will

24  hear testimony that my client made an awful choice.  And the

25  awful choice was to engage with this person, and this person

26  who said, "Kev will do the job for you," to kill someone.

27       You will be given instructions regarding entrapment.

28  I'm not going to go into those now.  They will be given you at

December 9, 2004

1    the close of the case.  But I am suggesting to you that the

2    evidence will show that when you apply the law regarding

3    entrapment to what you hear about what happened over the

4    course of that week or ten days, not that you will find that

5    what my client did was good or bright, but that he was

6    entrapped and, as such, not guilty of those charges.

7        Thank you.

8        THE COURT:  All right.  Thank you.  You may now call

9    your first witness.

10        MR. HERNANDEZ:  We'll call Anthony Johnson, your Honor.

11        THE COURT:  Madam Clerk?

12        THE CLERK:  Please raise your right hand.

13

14                    **ANTHONY JOHNSON**,

15   called as a witness on his own behalf, having been first duly

16                sworn, testified as follows:

17        THE CLERK:  Please state your name for the record.

18        THE WITNESS:  Anthony J-O-H-N-S-O-N.

19                **DIRECT EXAMINATION**

20        MR. HERNANDEZ:  Q.  Morning, Mr. Johnson.

21    A   Morning.

22    Q   Where do you live these days?

23    A   Sonoma County Adult Detention Facility.

24    Q   That's the Sonoma County Jail?

25    A   Yes, sir.

26    Q   Sir, I'm going to ask if you could -- and at least at

27   this point, you're kind of quiet -- I'm going to ask that you

28   either move a little closer to the mike --

# EXHIBIT COVER PAGE $\boxed{\text{B}}$

EXHIBIT

Description of this Exhibit:

THE TRIAL COURT VIOLATED PETITIONER'S RIGHT TO PRESENT A
DEFENSE AND TO A FAIR TRIAL BY THE CUMULATIVE EFFECT OF
THE FOREGOING ERROR AND REFUSING TO INSTRUCT THE JURY ON
ENTRAPMENT ...

Number of pages to this Exhibit: __8__ pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

1    passed, then the Court must rule, must set aside the

2    judgment.

3            We'll submit it, Your Honor.

4            THE COURT:  All right.  In reviewing the

5    matter, if we assume for the moment that your argument

6    that the CI becomes an agent, the Court would then have

7    a duty to determine that there's any -- if a disclosure

8    of the informant would or could even result in the

9    production of some exculpatory evidence.  So the Court

10   did have an _in_ _camera_ hearing.  As a result of the

11   _in_ _camera_ hearing, it was the Court's opinion that

12   whatever evidence would be developed because of that

13   would be incriminatory, not exculpatory.  So the Court

14   found there was no need to disclose the confidential

15   informant and acted on the issue whether the jury

16   should or should not have got the entrapment

17   instruction.  We had the defendant's testimony.  We had

18   Officer Tosti's testimony.  The Court also has the

19   benefit of the testimony heard at the _in_ _camera_, which

20   was totally unsupportive of the position taken and the

21   testimony of your client.

22           So the Court finds there was insufficient

23   evidence to go ahead to allow the jury to receive -- to

24   consider the entrapment theory, and therefore, the

25   Court denied that request and that instruction.  And

26   the Court would therefore deny the motion for new

27   trial.

28           MR. HERNANDEZ:  Thank you, Your Honor.

                                                    13

1       THE COURT:  All right, 1:25.

2          (Lunch recess.)

3          (Without jury.)

4       THE COURT:  Back on the record in People versus

5    Johnson, 31911.  Defendant present, counsel present, jury

6    waiting outside.

7          MR. HERNANDEZ:  Good afternoon, Judge.  Thank you.

8          We're going to ask again that this court mistry this

9    matter on the following basis:

10         Just before argument began, your Honor, we addressed

11   the court to confirm my understanding of the court's ruling.

12   And my understanding, even though not explicit at the last

13   setting, was to the effect, given the court would allow no

14   instructions regarding the defense that we were to offer, that

15   no argument was to be made as regards that defense.

16         Now, the people were then in a position, given that

17   they have final closing, to wait to see if indeed, A, the

18   defense was going to abide by the court's ruling, which the

19   court will see I certainly am going to; and B, if not, do one

20   of two things:  Object as inappropriate argument, or rebut the

21   defense.  The people chose to rebut the defense in their

22   opening, after this court ordered that I could not address it.

23   They specifically went into the threats that were discussed.

24   They specifically offered to this jury that they were

25   ridiculous, and they further offered that they did not rise to

26   the level of a defense.  Again, it was not in good faith.

27         This court ordered specifically, before argument was

28   made, that we could not go there.  As the court will see in my

                                                            1682

                    Karen E. Thompson, CSR No. 2792

1 closing, if there is one thing I will and have done at all
2 points in my career, your Honor, is to abide by these courts'
3 rulings.

4      I will not suggest it is a defense.  The court has
5 told me I may not suggest it's a defense.  Yet, my client, my
6 case, has been ridiculed, and it has been argued that it does
7 not rise to a defense.

8      I am going to ask one of two things, your Honor.

9      Given that the people -- again -- and I have to assume
10 that the court's order that that defense not be addressed
11 applied to the people as well.  I am going to ask either that
12 this case be mistried or that the defense be reopened so that
13 I can address the ridicule and the question of whether or not
14 it does rise to the level of a defense.  It should not have
15 been mentioned.  This court ordered it should not have been
16 mentioned.  This court refused instructions regarding that
17 defense, and it was the defense's intent and continues to be
18 my intent not to address it as a defense.  The people did so.
19 A mistrial is either appropriate, or now we get a chance to
20 offer the defense which they have rebutted.

21      Submitted, your Honor.

22      MS. COOK:  Your Honor, the people didn't address the
23 defense of entrapment.  The people addressed the testimony
24 that this jury heard and could consider, for whatever it's
25 worth.  They can consider the defendant's statements about why
26 he did what he did, and based on how the evidence came out,
27 the people believed that the defense would argue or have this
28 jury believe that this defendant never intended to kill Patti

1  because he was only acting based on this threat that he

2  received.  And that's how he testified.  He said he never

3  intended to kill her.  So that's one of the elements of the

4  crime the people have to prove.

5        So I just addressed the evidence that was before the

6  jury and how the people proved our case and how the

7  defendant's testimony on that element should not be believed.

8  I did not argue the elements of entrapment or that defense.

9  Only times I mentioned the word "entrapment" were when I

10 talked about how this defendant was planning his whole defense

11 in his letters, and his testimony was that he had been sending

12 instructions on entrapment to Cathy Petersen and talking about

13 how he was going to say or how she should say that she was

14 entrapped.  That was the only time the mention of the word

15 "entrapment" came up.  It was in reference to his testimony

16 that the jury already has before it.  So there was no improper

17 argument based on the law.

18        This court's ruling was that this counsel can't -- the

19 defense can't argue the defense of entrapment.  The people did

20 not argue the law on the defense of entrapment.  We argued the

21 elements of our crime and the defendant's testimony and how it

22 bore or did not bear on those elements.

23        MR. HERNANDEZ:  And, Judge, I'm going to -- I feel

24 quite confident that if the court reviews the record,

25 prosecutor argued two points.  Point number one, clearly he

26 had specific intent, and all of this evidence suggests so.

27 She argued a second point, and if the court will recall the

28 record, she further argued that the decision to kill someone

1684

1  to protect yourself from someone else does not rise to the

2  level of a defense.  That's different.  That is suggesting

3  that my defense is inappropriate because what we have

4  presented does not rise to that level.  That's not, "No, my

5  elements are proven," that is, "The defense is not met."

6  Those were the -- I'm not going to say the specific words --

7  "they do not rise to the level of a defense," are the people's

8  argument.

9       If the court reviews the record, there are both

10 points.  Number one, that you don't have the right to choose

11 to kill someone based on that; number two, that that was the

12 reason he did it was ludicrous; and number three, they argued,

13 he had specific intent.

14      The specific intent argument, I have no quarrel with

15 the argument.

16      And it's virtually a quote, and I believe the court

17 may remember.  I'm certain it's in the record:  "It does not

18 rise to the level of a defense."

19      A defense, in legal terms, your Honor, is affirmative.

20 It's not the people have failed.  That is, the people have

21 failed to show specific intent.  The people have failed to

22 offer a defense that we were precluded from discussing.  That

23 this court specifically ordered Mr. Hernandez -- and, again,

24 not in such terms, because we acquiesced -- you are not to

25 argue the defense.  And the people, nonetheless, went about --

26 and again, their argument is, well, he could have argued it

27 when -- in his closing.

28      They had the option to wait before they started

1685

Karen E. Thompson, CSR No. 2792

1  rebutting a defense that this court ordered could never be

2  addressed. They had an obligation to see to it that they had

3  something to rebut. We never brought up the defense, Judge.

4  We will not bring up the defense. The people have. We're

5  asking for a mistrial or to be allowed to, now that they have

6  rebutted it, offer the defense.

7      MS. COOK: Your Honor, the people's quote that counsel

8  is now referring to was that the threats that the defendant

9  testified to -- so I was referring to testimony the jury

10 already had before it -- is no defense. I did not argue the

11 issue of entrapment. It's no defense, and that is correct,

12 and that's a correct statement of the law. There is no reason

13 why I shouldn't be able to say that to the jury. It has

14 nothing to do with the elements of the crime of entrapment.

15     And then I followed that up -- after I gave an

16 example, I then followed up by saying, "And it doesn't change

17 the fact that he had the specific intent to kill her." And so

18 I tied it all into that. There is nothing wrong with me

19 saying that testimony that the defense brought out is not a

20 defense.

21     MR. HERNANDEZ: It is --

22     MS. COOK: That's not a violation of any court order.

23     MR. HERNANDEZ: It is a defense, Judge, if it's

24 entrapment. It is a defense. That's exactly the point. It

25 is a defense. And the people have now rebutted a defense that

26 we were not to mention.

27     THE COURT: All right. Well, the court ordered

28 that -- the court was not going to instruct on entrapment, and

1    the court directed the defense could not argue entrapment, and
2    neither side was to bring up entrapment.  The court does
3    recall the argument, and there was a mention about not being a
4    defense.  When the court heard it, the court was thinking that
5    there might be some attempt to argue either a self-defense or
6    something, or a threat somehow, as a defense.  The court did
7    not hear the word "entrapment," and I didn't hear anything
8    that would have suggested entrapment by the argument the
9    people made.  So therefore, at this time, the court would deny
10    the motion.  Deny your request to reopen.
11        MR. HERNANDEZ:  Just to make the record, the people
12    mentioned at least a half a dozen times entrapment, about the
13    letters between my client and Cathy Petersen, and then went on
14    to argue what he had told you does not rise to the level of a
15    defense.  What else are we talking about?
16        THE COURT:  I think -- I -- as I heard the argument,
17    those letters were not anywhere in my mind when I heard the
18    comment.  Again, I don't know sequentially when those
19    arguments were made, but the way I interpreted and listened to
20    it and heard it was that somehow, being coerced into doing
21    something is not a defense.
22        MR. HERNANDEZ:  And if I might?
23        Offering evidence that my client was setting up an
24    entrapment defense, and then to step in front of this jury and
25    say what he testified to does not set up a defense, that's my
26    point, that -- to ignore that the jury heard both of those
27    things from the prosecutor's mouth and that they somehow
28    cannot and will not link those things, even though they were

Karen E. Thompson, CSR No. 2792

1687

1  specifically mentioned, he is trying to fashion an entrapment

2  defense, and what he testified to does not rise to a defense,

3  that's exactly -- that was the only defense the people

4  mentioned.

5      We'll submit it, your Honor.

6      THE COURT:  All right.  Well, the court will stay with

7  the ruling denying a mistrial, denying the motion to reopen.

8  Perhaps it would be cleaner if we don't talk about -- I don't

9  know whether you planned to talk about other defenses or not,

10  but --

11      MR. HERNANDEZ:  I don't have any defenses, Judge --

12      THE COURT:  If you don't mention the word "defense,"

13  then I'll instruct neither side to mention the existence or

14  nonexistence of a defense in the remaining closing arguments.

15  Just keep it real clean.

16      With that, are we ready?

17      MR. HERNANDEZ:  We're ready, your Honor.

18      THE COURT:  Please bring the jury in.

19      (Jury present.)

20      THE COURT:  All right.  Record may again reflect

21  jurors back in the jury box, alternate present, defendant

22  present, counsel present.

23      MR. HERNANDEZ:  Thank you, your Honor.

24      THE COURT:  Mr. Hernandez?

25      MR. HERNANDEZ:  Thank you, your Honor.

26      Good afternoon, ladies and gentlemen.  First of all, I

27  want to reiterate everything that the court has said about

28  this not being evidence.  It certainly is not evidence.  In a

# PROOF OF SERVICE

(C.C.P. §2015.5; 28 U.S.C. §1745)

I MR. ANTHONY JOHNSON , am over the age of eighteen (18) years, and I (am) (am not) a party to the within cause of action. My address is:

ANTHONY JOHNSON

K-00750

CSP SACRAMENTO

P.O. BOX 290066

REPRESA CA 95671-0066

On, 5 / 12 08 , I served the following documents:

TRAVERSE

_____ on the below named individuals by depositing true and correct copies thereof in the United State mail in Represa, California, with postage fully prepaid thereon, addressed as follows:

| | |
|---|---|
| 1 DEPUTY ATTORNEY GENERAL/455 GOLDEN GATE AVE./SUITE 11000 SAN FRANCISCO CA 94102-7004 | 2 U.S. DISTRICT COURT NORTHERN DISTRICT ATT: COURT CLERK 1301 CLAY ST. SUITE 400S OAKLAND CA. 94612-5212 |

I have read the above statements and declare under the penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed this 12TH day of MAY , 2008 , at California State Prison at Sacramento, Represa, California.

(Signature) mr. anthony Johnson

Declarant

PRIORITY
MAIL
UNITED STATES POSTAL SERVICE
www.usps.com
Label 107R, February 2006

MR. ANTHONY C. JOHNSON SR./K-00750/F-13-7-232-4
P.O. SACRAMENTO
P.O. BOX 290066
REPRESA CA. 95671-0066

CALIFORNIA

OFFICE OF THE CLERK U.S. DISTRICT COURT-
NORTHERN DISTRICT OF CALIFORNIA
1301 CLAY ST. SUITE 400S
OAKLAND. CA. 94612-5212

UNITED STATES POSTAGE
02 1A
000-4658111
$ 04.05
MAILED FROM ZIP CODE 95671