IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANTHONY E. JOHNSON,

       Petitioner,

  v.

TONY MALFI, Warden, et al.,

       Respondents.

_____/

No. C 06-05539 CW

ORDER DENYING
PETITION FOR WRIT OF
HABEAS CORPUS

On September 11, 2006, Petitioner Anthony E. Johnson filed his petition for a writ of habeas corpus to vacate convictions resulting from two separate jury trials.  On April 9, 2007, Respondent filed an answer.  On April 17, 2007, Petitioner filed a traverse.  On December 28, 2007, Petitioner filed a second traverse.  On February 12, 2008, Respondent filed a supplemental answer.  On May 16, 2008, Petitioner filed a supplemental traverse. Petitioner has also filed a "motion of inquiry" and a motion to appoint counsel.

Having considered all the papers filed by the parties and the state court trial record, the Court DENIES the petition and DENIES the "motion of inquiry" and motion to appoint counsel.

BACKGROUND

On October 9, 2002, in case number SCR-31910, Petitioner was found guilty of forcible rape, forcible oral copulation, forcible sexual penetration by a foreign object, robbery, burglary and terrorist threats.  As to the first three counts, the jury found to

be true the allegations that Petitioner had tied or bound the victim and that he committed the sexual offense during a burglary. Petitioner admitted that he had served two prior prison terms.

On December 11, 2002, in case number SCR-31911, Petitioner was found guilty of solicitation to commit murder and conspiracy to commit murder.

On April 10, 2003, Petitioner was sentenced on both cases to a determinate term of twenty-five years and an indeterminate term of fifty years to life in prison.  Petitioner filed a direct appeal to the California court of appeal which affirmed the convictions in a written opinion.  The California Supreme Court denied Petitioner's petition for review.

The state court of appeal described the following facts underlying Petitioner's convictions.

Rape and Robbery Trial

On November 21, 2001, the victim, P., was working in the Redwood Gospel Mission Thrift Store in Santa Rosa. Defendant had previously worked in the store, and P. recognized him immediately when he walked in.  He did not say hello, and walked straight to the back of the store. P. soon forgot defendant was there, and at 5:00 p.m. she emptied the register and turned out the lights. As she walked to the front of the store, she was tackled from behind, and thrown to the ground.  Her assailant dragged her by the hair into the employee break room, covered her eyes with duct tape, and bound her hands and feet.  P. recognized defendant's voice when he demanded money.  She could also see him through gaps in the duct tape.  She told him to calm down and she would give him whatever he wanted.  Defendant took her purse and then dragged her to the office, where he took the keys from her purse and unlocked the safe.  Defendant told her to kneel in a corner while he removed the money and a surveillance videotape.  Defendant then dragged P. back to the employee break room where he sexually assaulted her, committing each of the sexual offenses with which he was charged.  He then asked P., "Do you know who I am?" Fearing for her life, P. lied, and said she did not. Defendant responded, "Well, I know who you are, and if you tell . . . I'll come back and I will kill you."  He

2

left the store, taking her purse with him.  P. immediately called 911.  She told the police she knew her assailant, but could not remember his name.  She identified defendant in a photographic lineup, and at trial.  DNA testing matched sperm found in a sexual assault exam of P. to a known sample from defendant.  The chances of a false match were 1 in 3.3 trillion African Americans, 1 in 3.3 trillion Caucasians, and 1 in 14 trillion Hispanics.  After defendant was arrested, P. received two collect calls from him, which she refused.  Defendant also called the thrift store manager, and asked if she intended to testify at the preliminary hearing.  She said no, and hung up.

Conspiracy and Solicitation to Commit Murder Trial

P. testified in this separate trial and recounted the sexual assault and robbery.  She also testified that defendant told her he knew who she was and that he would come back and kill her if she reported the incident.

Defendant's wife, Cathy Petersen-Johnson (hereafter Petersen) pleaded guilty to solicitation to commit the murder of P., and agreed to testify truthfully at defendant's trial in exchange for a sentence of nine years eight months in prison.  Petersen testified that defendant was arrested on November 22, 2001.  She visited him every day, after she finished work.  During one of her visits, defendant asked her whether she thought the charges would be dismissed if P. were "gone."  She said she did not know.  Defendant asked her to visit the thrift shop and find out whether P. still worked there.  He gave Petersen a description of P. and a copy of the police report.  Petersen suspected that defendant wanted to locate P. so he could have her killed.  Hoping to get him "off the track," she suggested she could call people in Oakland for help.  Although she did not actually call anybody, she told defendant that she had, and that it would cost $5,000, but that the people in Oakland were busy.

During the last week in November 2001, Detective Mike Tosti of the Santa Rosa Police Department received information from a confidential informant that defendant was trying to find someone to kill P.  Tosti consulted with Detective Badger, who was working on the rape and robbery case, and after Detective Tosti had two or three more contacts with the informant to verify the credibility of the tip and to get more information, Tosti decided to go undercover as a hit man to meet defendant.  Around that same time, defendant told Petersen that someone in jail had offered to help with his "predicament."  Eventually defendant called her at home with the number of a hit man named "Kev," and asked her to call and arrange a meeting between "Kev" and

**United States District Court**
For the Northern District of California

defendant.   Before defendant gave her this telephone
number, she and defendant had already discussed that she
would take care of "the money end."   Petersen understood
that "Kev" was the hit man defendant wanted to hire to
kill P., and Petersen agreed to act as the "money
person."

Petersen then called Detective Tosti, who was posing as
"Kev," and arranged for "Kev" to meet defendant the next
day.   In a tape-recorded conversation, defendant told
Detective Tosti that "this person's just in the way, you
know," and "I just need her handled . . . whatever the
price is . . . ."   Detective Tosti asked if defendant
just wanted to scare her, and defendant replied, "No
. . . . That's another chance of her coming back."
Detective Tosti cautioned defendant that it would cost
more to kill her, and defendant replied that money would
not be a problem.   They agreed on a price of $5,000, with
$1,000 as a down payment.   Detective Tosti asked whether
defendant wanted to send a message or make it look like
an accident.   Defendant replied that he wanted her
"chopped up."   At the end of the conversation Detective
Tosti asked whether defendant was sure this is what he
wanted, and defendant confirmed, "I'm positive," adding,
"It's either you, or I go find somebody else."

Later that same day Detective Tosti contacted Petersen,
and tape-recorded his conversation with her.   They
discussed a payment plan, and agreed that Petersen would
pay $200 that day and $800 on the following Friday.   They
met later in a parking lot, and Petersen gave Tosti $200.
Detective Tosti told Petersen that defendant wanted P.
dead, and asked Petersen if she was "all right with
that," and she confirmed that she was.

When Petersen met with defendant in jail, defendant was
upset that she had only paid "Kev" $200.   Petersen said
she did not want to go through with it.   Defendant became
angry, and yelled at Petersen to "squash it," meaning to
cancel the plan.   Soon thereafter Petersen was arrested.

Defense

Defendant presented no defense evidence in the rape and
robbery case.   In the solicitation to commit murder trial
he testified on his own behalf.   He testified that
shortly after his arrest, an inmate named Marvin Jackson,
also known as "M.J.," asked him about the pending
charges, and offered to help.   Defendant understood the
offer to relate to hiring private counsel.   When he
finally realized that Jackson was suggesting killing the
witness, defendant was "shocked," and declined.   Jackson
continued to pressure defendant, telling him that it
"needs to be done."   Eventually Jackson stated that
defendant would die in prison if he did not kill P.   He

4

United States District Court
For the Northern District of California

1

told defendant that there were people waiting for him in
prison who would make him die a "slow and long death."
Defendant knew he had enemies in prison, but thought he
had "squashed them."  Defendant knew Jackson was
affiliated with gang members, and understood Jackson to
be saying that he would issue an order to kill defendant,
if defendant went to prison.  Defendant ultimately agreed
to call a hit man and arrange to have P. killed because
he was afraid of what Jackson had threatened would happen
to him if he were convicted and went to prison.

Defendant also admitted sending letters to his wife while
he was awaiting trial on these charges.  These letters
set forth the elements of entrapment, and statements in
them could be construed as attempts to coach her
testimony.  One letter warned her, ". . . anything you do
in life, whether it be petty or large, there is always
consequences to everything, no matter what.  Just be
ready to pay the price."

Respondent's Ex. 9 at 2-5.

LEGAL STANDARD

A federal court may entertain a habeas petition from a state

prisoner "only on the ground that he is in custody in violation of

the Constitution or laws or treaties of the United States."  28

U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death

Penalty Act (AEDPA), a district court may not grant a petition

challenging a state conviction or sentence on the basis of a claim

that was reviewed on the merits in state court unless the state

court's adjudication of the claim: "(1) resulted in a decision that

was contrary to, or involved an unreasonable application of,

clearly established federal law, as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based

on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding."  28 U.S.C.

§ 2254(d).  A decision is contrary to clearly established federal

law if it fails to apply the correct controlling authority, or if

it applies the controlling authority to a case involving facts

5

materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. Clark v. Murphy, 331 F.3d 1062, 1067 (9th. Cir. 2003).

Even if the state court's ruling is contrary to or an unreasonable application of Supreme Court precedent, that error justifies habeas relief only if the error resulted in "actual prejudice." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is the holdings of the Supreme Court as of the time of the relevant state court decision. Williams v. Taylor, 529 U.S. 362, 412 (2000).

To determine whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established law, a federal court looks to the decision of the highest state court that addressed the merits of a petitioner's claim in a reasoned decision. LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the state court only considered state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. Lockhart v. Terhune, 250 F.3d 1223, 1230 (9th Cir. 2001).

DISCUSSION

I. Admission of Evidence of Other Sexual Offenses

Petitioner presents a facial and as-applied due process challenge to California Evidence Code § 1108, which allows the admission of evidence of prior sexual offenses, so long as the evidence is admissible under California Evidence Code § 352, which requires excluding evidence where its probative value is substantially outweighed by the possibility that it will consume an

United States District Court
For the Northern District of California

undue amount of time or create a substantial danger of undue

prejudice or confusion.  Section 1108 changed the general rule that

character evidence is inadmissible to prove a defendant's conduct

on a specified occasion.  <u>See</u> Cal. Code Evid. § 1101; <u>People v.

Falsetta</u>, 21 Cal. 4th 903, 911 (1999).  Petitioner also argues his

equal protection rights were violated by the trial court's

admission of prior sexual offenses.

A. State Court's Opinion

The state appellate court addressed this claim as follows.

In the rape and robbery trial the court admitted evidence
of several uncharged sexual offenses, pursuant to
Evidence Code § 1108.  The evidence was as follows:  A
clinical psychologist testified that on August 7, 2000,
defendant stayed after an evening class and exposed his
penis to her.  She reported the incident the next day.  A
correctional officer testified that on March 5, 2002,
defendant was in the exercise yard, and was holding his
erect penis while glaring at her.  She reported the
incident and defendant was removed from the yard.  He
later apologized to her.  Finally, on August 7, 2002, a
doctor who worked at the county jail observed defendant
standing on a bed facing her and rubbing his penis.  The
doctor immediately reported the incident to a
correctional officer.

Defendant first raises a due process challenge to section
1108 that he acknowledges our state Supreme Court has
already rejected in <u>People v. Falsetta</u> (1999) 21 Cal. 4th
903, 913-9 7, 919-922.  He raises the argument only to
preserve it for federal review.  This court, of course,
is bound to follow <u>Falsetta</u>. . . .  Although the court
did not decide an equal protection challenge to section
1108, it did cite with approval the decision in <u>People v.
Fitch</u> (1997) 55 Cal. App. 4th 172. (<u>Falsetta</u>, <u>supra</u>, at
918.)  In <u>Fitch</u>, the court offered a well-reasoned
analysis of the rational basis for distinguishing sex
offenses from other types of offenses, and concluded that
the seriousness and secretive commission of sex offenses,
resulting in trials that are primarily credibility
contests, justified the admission of uncharged sex
offenses.  (<u>Fitch</u>, <u>supra</u>, at 184.)  We agree with this
analysis. . . .

Defendant next contends that, even if otherwise
admissible pursuant to section 1108, the court abused its
discretion by failing to exclude the evidence of these

United States District Court
For the Northern District of California

uncharged sexual offenses under section 352 because the uncharged acts were too dissimilar to the charged offenses to have any relevance.  We find no abuse of discretion.  "The charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under [section] 1101, otherwise [section] 1108 would serve no purpose.  It is enough the charged and uncharged offenses are sex offenses as defined in section 1108." (People v. Frazier (2001) 89 Cal. App. 4th 30, 40-41.)  Each of the uncharged acts were sex offenses as defined in section 1108.  They were not remote because they occurred within two years of the charged offenses.  They were less inflammatory than the charged offense because they only involved nonviolent conduct.  (Cf. People v. Harris (1998) 60 Cal. App. 4th 727, 738.) . . . There was little risk of confusion of issues or undue consumption of time because the facts were not complex, and the testimony concerning each uncharged offense was brief. (See People v. Branch (2001) 91 Cal. App. 4th 274, 282; People v. Harris, supra, at 737-741.)

In any event, any error in the admission of the evidence of the uncharged sexual offenses was harmless, in light of the overwhelming evidence of guilt.  (People v. Watson (1956) 46 Cal. 2d 818, 836.)  The victim recognized defendant from prior contacts, and identified him in a photographic lineup at trial.  The DNA test matched defendant's sperm with the sample taken from the victim.  Nor was there any plausible defense of consent, because the sexual assault exam was consistent with forced intercourse, and when the police arrived on the scene the victim was still bound with duct tape and crying hysterically.

Respondent's Ex. 9 at 5-7.

B. Applicable Federal Law

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999).  The due process inquiry on federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  Walters v. Maass, 45 F.3d 1355, 1357 (9th

United States District Court
For the Northern District of California

Cir. 1995).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.  <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 920 (9th Cir. 1991).

The United States Supreme Court has left open the question of whether admission of propensity evidence violates due process.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 75 n.5 (1991).  The Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established as required by AEDPA based upon the Supreme Court's reservation of this issue as an "open question" in <u>Estelle</u>.  <u>Alberni v. McDaniel</u>, 458 F.3d 860, 866-67 (9th Cir. 2006).  However, the Ninth Circuit has also held that Federal Rule of Evidence 411, allowing evidence of prior sexual offenses to show a propensity to commit a charged sexual offense, does not violate due process because the evidence is still subject to the trial court's balancing test which provides for meaningful review.  <u>United States v. LeMay</u>, 260 F.3d 1018, 1031 (9th Cir. 2001).

C. Analysis

1. Facial Challenge

Because the United States Supreme Court explicitly reserved the issue of whether admission of propensity evidence is unconstitutional, a habeas petitioner cannot show, as is required by AEDPA, that a state court unreasonably applied established federal law by concluding that an evidentiary rule allowing propensity evidence is constitutional.  Thus, Petitioner's claim that California Evidence Code § 1108 is unconstitutional on its face fails.

**United States District Court**
For the Northern District of California

### 2. As-Applied Challenge

Petitioner argues that the admission of the uncharged sexual misconduct rendered his trial fundamentally unfair because his past acts of indecent exposure were so dissimilar to the violent sexual offenses charged against him that they were irrelevant on the issue of propensity.  Petitioner argues that the court should have ruled the evidence was inadmissible under California Rule of Evidence 352 because it was more prejudicial than probative.

The appellate court reviewed the uncharged offenses and determined that they would not prejudice the jury.  They were not remote in time because they had occurred within two years of the charged offenses; they were not inflammatory because they were not violent; and there was little risk of confusion of issues because the facts were not complex and the testimony regarding each offense was very brief.

The state court's denial of this claim was not contrary to or an unreasonable application of clearly established federal law.

### 3. Equal Protection Claim

Petitioner merely mentions this claim in his federal petition but presents no argument on it.  He submits his petition to the California Supreme Court in which he did present argument on this claim.  Respondent addresses this claim in his answer.  Therefore, in the interests of justice, the Court addresses the Equal Protection claim.

Petitioner argues that § 1108 violated his equal protection rights because the statute singles out for unequal treatment individuals who are accused of committing sexual offenses. Petitioner contends that he should be treated like other

United States District Court
For the Northern District of California

individuals who are accused of committing non-sexual crimes.

Petitioner fails to point to any Supreme Court authority which supports the theory that persons accused of committing sexual offenses should be treated the same as those accused of committing non-sexual offenses. For this reason alone, under AEDPA, Petitioner's claim fails because the state court, in denying this claim, did not unreasonably apply Supreme Court authority.

Furthermore, in <u>Lemay</u>, 260 F.3d at 1030-31, the Ninth Circuit rejected an equal protection claim in regard to Federal Rule of Evidence 414, which applies to child molestation cases, but which is otherwise identical to § 1108. In <u>Lemay</u>, the court pointed out that sex offenders are not a suspect class under the Fourteenth Amendment. <u>Id.</u> at 1030. The court found that "Rule 414 is constitutional if it bears a reasonable relationship to a legitimate governmental interest," that prosecuting crime effectively is a legitimate governmental interest and that Rule 414 furthers that interest by allowing the prosecution to introduce relevant evidence to help convict sex offenders. <u>Id.</u> at 1031. This analysis also applies to § 1108. Therefore, Petitioner's Equal Protection claim is DENIED.

II. Instructing Jury with CALJIC No. 2.50.01

Petitioner argues that the jury instructions with respect to prior acts of sexual offenses violated his due process rights because they allowed the jury to convict him based solely on the prior acts under a preponderance of the evidence standard.

A. State Court's Opinion

The state appellate court addressed this claim as follows.

Defendant also challenges the court's instruction to the

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

   jury on the use of evidence of uncharged sexual offenses
   in accordance with the revised version of CALJIC No.
   2.50.01.  His contention that this instruction violates
   due process, because it permits a jury to convict the
   defendant of the charged offense solely on evidence of
   the uncharged offenses proved by a preponderance of the
   evidence and therefore impermissibly lowers the
   prosecutor's burden of proof, has been rejected by our
   Supreme Court in <u>People v. Reliford</u> (2003) 29 Cal. 4th
   1007, 1013-1016.  Defendant acknowledges that <u>Reliford</u> is
   binding on this court.

7

Respondent's Ex. 9 at 7.

8

   In regard to CALJIC 2.50.01, the <u>Reliford</u> court explained:

9

10

11

12

13

14

   We do not find it reasonably likely a jury could
   interpret the instructions to authorize conviction of the
   charged offenses based on a lowered standard of proof.
   Nothing in the instructions authorized the jury to use
   the preponderance-of-the-evidence standard for anything
   other than the preliminary determination whether
   defendant committed a prior offense . . .  The
   instructions instead explain that, in all other respects,
   the People had the burden of proving defendant guilty
   "beyond a reasonable doubt."  Any other reading would
   have rendered the reference to reasonable doubt a
   nullity.

15

<u>Reliford</u>, 29 Cal. 4th at 1016.

16

17

   B. Applicable Federal Law

18

   To obtain federal collateral relief for errors in the jury

19

charge, a petitioner must show that the ailing instruction by

20

itself so infected the entire trial that the resulting conviction

21

violated due process.  <u>Estelle</u>, 502 U.S. at 72; <u>see also</u> <u>Donnelly</u>

22

<u>v. DeChristoforo</u>, 416 U.S. 637, 643 (1974) ("'[I]t must be

23

established not merely that the instruction is undesirable,

24

erroneous or even "universally condemned," but that it violated

25

some [constitutional right].'").  The instruction may not be judged

26

in artificial isolation, but must be considered in the context of

27

the instructions as a whole and the trial record.  <u>Estelle</u>, 502

28

U.S. at 72.

1    C. Analysis

2    The instruction the court gave to the jury, based on CALJIC

3    No. 2.50.01 on the use of uncharged offenses, provided, in relevant

4    part:

5        Evidence has been introduced for the purpose of showing
         that the defendant engaged in a sexual offense on one or
6        more occasions other than that charged in the case.

7        . . .

8        If you find that the defendant committed a sexual offense
         on another occasion other than this charged, you may but
9        are not required to infer that the defendant had a
         disposition to commit sexual offenses. If you find that
10       the defendant had this disposition, you may but are not
         required to infer that he was likely to commit and did
11       commit the crime or crimes of which he is accused.

12       However, if you find by a preponderance of the evidence
         that the defendant committed other sexual offenses, then
13       it's not sufficient by itself to prove beyond a
         reasonable doubt that he committed the charged offenses.
14       If you determine an inference can properly be drawn from
         this evidence, this inference is simply one item for you
15       to consider along with all the other evidence in
         determining whether the defendant has been proved guilty
16       beyond a reasonable doubt of the charged crimes.

17       You must not consider this evidence for any other
         purpose.
18
     RT 924-25; CT 187.
19
20   The trial court also instructed the jury, based on CALJIC No.

21   2.50.1, as follows:

22       Within the meaning of the preceding instructions, the
         prosecution has the burden of proving by a preponderance
23       of the evidence that a defendant committed sexual
         offenses other than those for which he is on trial.

24       You must not consider this evidence for any other purpose
25       unless you find by a preponderance of the evidence that a
         defendant committed a sexual offense.

26       If you find sexual offenses were committed by a
         preponderance of the evidence, you are nevertheless
27       cautioned and reminded that before a defendant can be
         found guilty of any crime charged or any included crime
28       in this trial, the evidence as a whole must persuade you

13

United States District Court
For the Northern District of California

beyond a reasonable doubt that the defendant is guilty of that crime.

RT 925; CT 188.

These instructions, taken together, clearly informed the jury that proof by a preponderance of the evidence that Petitioner committed another sexual offense is not sufficient to prove beyond a reasonable doubt that he committed the charged crimes.  The instructions also clearly informed the jury that, before Petitioner could be found guilty of any charged crime, the evidence as a whole must establish beyond a reasonable doubt that Petitioner was guilty of committing that crime.

The state court's analysis of this claim was not contrary to, or an unreasonable application of, Supreme Court precedent.

III. Jury Trial on Sentencing Factors.

Petitioner urges that he was denied his Sixth Amendment right to a jury trial because the court imposed upper terms on counts two, three and four based on factual findings made by the court, instead of a jury, in violation of Blakely v. Washington, 542 U.S. 296 (2004), and Apprendi v. New Jersey, 530 U.S. 466 (2000).

A. State Court Opinion

The state appellate court based its denial of this claim on People v. Black, 35 Cal. 4th 1238, 1254 (2005), in which the California Supreme Court had held that "a trial court's imposition of an upper term sentence does not violate a defendant's right to a jury trial under the principles set forth in Apprendi, Blakely, and Booker."[1]  However, in Cunningham v. California, ___ U.S. ___, 127 S.Ct. 856, 871 (2007), the United States Supreme Court held that

_____

[1]United States v. Booker, 543 U.S. 220 (2005).

14

California's determinate sentencing law was unconstitutional because it allowed the judge, not the jury, to find the facts permitting the court to impose an upper term sentence.  In <u>Butler v. Curry</u>, 528 F.3d 624, 639 (9th Cir. 2008), the Ninth Circuit held that <u>Cunningham</u> did not announce a new rule and thus applies retroactively on habeas review.

B. Relevant Federal Law

In <u>Apprendi</u>, the United States Supreme Court held that, "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 488-90.  The "statutory maximum" for <u>Apprendi</u> purposes is the maximum sentence a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant; that is, the relevant "statutory maximum" is not the sentence the judge could impose after finding additional facts, but rather is the maximum he or she could impose without any additional findings. <u>Blakely</u>, 542 U.S. at 303-04.  In <u>Cunningham</u>, the Court concluded that the middle term specified in California's statutes, not the upper term, was the relevant statutory maximum; therefore, California's determinate sentencing law violated the Sixth Amendment because it authorized the judge, not the jury, to find the facts permitting an upper term sentence.  <u>Cunningham</u>, 127 S.Ct. at 871.

C. Analysis

Respondent argues that this claim must be dismissed because <u>Cunningham</u> does not apply retroactively.  However, as noted above, this argument was rejected by the Ninth Circuit in <u>Butler</u>, 528 F.3d

15

at 639.

Respondent next argues that this claim must be dismissed because *Cunningham* was not decided when the California appellate court ruled on this claim and, thus, the claim is unexhausted. However, again, in *Butler*, the Ninth Circuit explained that "where there is no new rule announced, the state court has had a fair chance to address the issue when it was raised, and there is no reason to require further exhaustion."  528 F.3d at 639. Therefore, this claim is exhausted; Respondent's second argument for dismissal fails.[2]

Pointing to the sentencing hearing, Respondent's Ex. 4, Vol. 8 at 26, Respondent argues that the appellate court's decision was not unreasonable because the upper term sentences were acceptable under *Apprendi* and *Cunningham* in that they were based, in part, on Petitioner's prior convictions.  Respondent points out that the trial court found that Petitioner was "on State parole when [he] committed these crimes" and that Petitioner's "performance on probation and parole were unsatisfactory."  Id.  Citing United States v. Corchado, 427 F.3d 815, 820 (10th Cir. 2005) and United States v. Fagans, 406 F.3d 138, 141 (10th Cir. 2005), Respondent submits that other circuits have ruled that the prior conviction exception to *Apprendi* extends to subsidiary findings regarding the priors, such as that a defendant was on probation or under another type of court supervision when he or she committed the subsequent crime.

---

[2]Respondent did not have the benefit of the Ninth Circuit's decision in *Butler* when he submitted his answer; *Butler* was decided on June 9, 2008; Respondent's answer was submitted on April 9, 2007 and his supplemental answer was submitted on February 12, 2008.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

The Ninth Circuit addressed this issue in Butler as well. There, the petitioner, who had been sentenced to the upper term under California's determinate sentencing law, claimed that this violated his Sixth Amendment rights because it was based on two aggravating factors not proved to a jury beyond a reasonable doubt. 528 F.3d at 628. The Ninth Circuit concluded that the state court's decision was contrary to established Supreme Court precedent because it violated Apprendi.

The Ninth Circuit addressed the respondent's argument that the aggravating factor that the petitioner was on probation at the time of the crime came within the prior conviction exception. The court explained that the prior-conviction exception is a narrow one that applies only to "those facts that can be established by the 'prior judicial record' of conviction," not to secondary facts that are derived from that record. Id. at 644-45. In California, a judge retains the authority to terminate probation early; thus, the fact that a defendant was sentenced to a certain term of probation at the time of the prior conviction is insufficient to prove that he was on probation at the time of the current crime. Id. at 646. Butler specifically disapproved of Corchado and Fagans, the cases upon which Respondent relies. Id. at 641.

However, the Ninth Circuit noted that a petitioner is entitled to relief only if the sentencing error is prejudicial under Brecht v. Abrahamson. Id. at 648.

> Under [the Brecht] standard, we must grant relief if we are in "grave doubt" as to whether a jury would have found the relevant aggravating factors beyond a reasonable doubt. . . . Further, in conducting harmless error review of an Apprendi violation, we may consider evidence presented at sentencing proceedings.

17

1
2
3
4
> Apprendi errors are harmless when we can ascertain that a
> judge was presented with sufficient documents at
> sentencing--including the original conviction documents
> and any documents evidencing modification, termination,
> or revocation of probation--to enable a reviewing or
> sentencing court to conclude that a jury would have found
> the relevant fact beyond a reasonable doubt.

5  Id. at 647 n.14, 648 (citations omitted).

6      Noting that California requires only one aggravating factor to

7  impose the upper term, the court explained that any Apprendi error

8  "will be harmless if it is not prejudicial as to just one of the

9  aggravating factors at issue." Id. at 648.  As well as finding

10  that the petitioner was on probation at the time of the crime, the

11  trial court had found a second aggravating factor: a vulnerable

12  victim.  Id. at 649, 651.  The Ninth Circuit concluded that it had

13  grave doubt as to whether a jury would have found, beyond a

14  reasonable doubt, that the victim was particularly vulnerable.  Id.

15  at 651.  Regarding the petitioner's probationary status, the court

16  found that the record did not reveal what evidence was presented to

17  the state sentencing court and thus it remanded to the district

18  court for an evidentiary hearing.

19      Here, the record does not establish that the fact that

20  Petitioner was on probation or parole at the time of the offense

21  was plead and proved to a jury beyond a reasonable doubt.  Thus,

22  the Court must address whether, under Brecht, this violation had a

23  substantial and injurious effect on the sentence.  As in Butler,

24  the record does not show that sufficient evidence was presented to

25  the sentencing court to prove that Petitioner was on parole at the

26  time of his conviction.

27      However, the sentencing court found the following additional

28  aggravating factors: (1) the criminal activity reveals a high level

18

of cruelty and callousness; (2) the manner in which the crimes were committed indicates planning; and (3) the crimes involved violent conduct which indicates that Petitioner is a serious danger to society.  Ex. 4. Vol. 8, at 26.[3]  Before making these findings, the trial court recited the circumstances of the offenses for which Petitioner was found guilty.

> It started out with the burglary of a store and then, for reasons which this Court can never understand, rather than simply committing a burglary, Mr. Johnson, you then sexually assaulted, raped and violated the woman in there. . . .
>
> When you're in there apparently to perform the burglary, and then because, I guess the opportunity presents itself, that's what happened.  That turned out [to] be a very vicious, vicious rape, with the binding of the hands, feet, putting the tape around her head.  I mean, it's a very vicious crime.
>
> Then after the arrest on that, the next event we have is you decide if there is, as I think your phrase was, "No victim, no crime."  So you decided you wanted to have her killed.  So you did what you could to hire somebody to go out and kill her.
>
> . . .
>
> It's the Court's purpose, at this phase, really, given crimes of this nature, to protect society and protect our citizens from people like you, willing to commit crimes like this. . . . I can't find a word to describe these kinds of crimes; horrible, heinous, despicable.  All those words are available, but to be so violative of another person and then, on top of it to try to kill them, I just -- I have -- I can't find a word that would express the distaste with which this Court views those kinds of acts.

_____

[3]Rule 4.421 of the California Court Rules provides the circumstances in aggravation for purposes of sentencing.  Three of the circumstances are: (1) "the crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness," Cal. Ct. Rule 4.421(a)(1); (2) "the manner in which the crime was carried out indicates planning, sophistication, or professionalism," Cal. Ct. Rule 4.421(a)(8); and (3) "the defendant has engaged in violent conduct that indicates a serious danger to society," Cal. Ct. Rule 4.421(b)(1).

United States District Court
For the Northern District of California

Ex. 4, Vol. 8 at 24-25.

Under California law, aggravation means that, when compared to other ways in which such a crime could be committed, the manner of commission of the crime indicates that the offense was distinctively worse than the ordinary. People v. Webber, 228 Cal. App. 3d 1146, 1169 (1991). Although this question was not presented to a jury, there is little doubt that, based on the evidence presented at trial, a jury would have found beyond a reasonable doubt that Petitioner's crimes revealed a high level of cruelty and callousness and that the crimes involved violent conduct which indicated Petitioner is a serious danger to society. See Rich v. Martel, 2008 WL 2788322, *11 (E.D. Cal.) (concluding, under Brecht, that Sixth Amendment sentencing violation was harmless because, based on the indisputable facts, the jury would have found beyond a reasonable doubt that the victim was particularly vulnerable).

For this reason, the Apprendi violation was not prejudicial and thus does not warrant habeas relief.

IV. Refusal to Instruct on Entrapment Defense

In Petitioner's trial for conspiracy and solicitation to commit murder, he sought a jury instruction on entrapment, which the trial court refused to give. Petitioner claims that this refusal violated his due process right to present a defense and his Sixth Amendment right to a jury trial.

A. State Court Opinion

The appellate court addressed this claim, in relevant part, as follows:

The entrapment defense was based upon defendant's

United States District Court
For the Northern District of California

testimony that another inmate, Marvin Jackson, had threatened defendant, telling him he would be killed if he went to prison, and the only way to avoid that fate would be to arrange for someone to kill P., the victim. Defendant also testified that Marvin Jackson went by the nickname "M.J." and, in his meeting with defendant, Detective Tosti asked defendant how "M.J." was doing, thereby supporting an inference that M.J. was working with Tosti as an informant.  The trial court found this was insufficient evidence to support giving the instruction.  Defendant contends that he presented substantial evidence to support an entrapment instruction, and the error violated his due process right to present a defense and his Sixth Amendment right to a jury trial because entrapment was his only defense to the solicitation charge.

"The trial court was required to instruct . . . on the defense of entrapment if, but only if, substantial evidence supported the defense.  [Citations.]  In California, the test for entrapment focuses on the police conduct and is objective.  Entrapment is established if the law enforcement conduct is likely to induce a <u>normally law-abiding person</u> to commit the offense. [Citation.]  '[S]uch a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully.  Official conduct that does no more than offer that opportunity to the suspect --for example, a decoy program--is therefore permissible; but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime.' [Citation]." (<u>People v. Watson</u>, (2000) 22 Cal. 4th 220, 222-223.)

The mere fact that Detective Tosti pretended to be a hit man in response to information that defendant was looking for one would not constitute entrapment.  "[T]he rule is clear that 'ruses, stings, and decoys are permissible stratagems in the enforcement of criminal law, and they become invalid only when badgering or importuning takes place to an extent and degree that is likely to induce an otherwise law-abiding person to commit a crime.'" (<u>Provigo Corp. v. Alcoholic Beverage Control Appeals Bd.</u> (1994) 7 Cal. 4th 561, 569.) . . . Yet, defendant does not contend that Detective Tosti, in his undercover role as a hit man, said or did anything to induce defendant to commit the crime.  To the contrary, the transcripts of Tosti's meetings with defendant show that he gave defendant the option to simply "fuck [P.] up and put the fear of God" in her, in other words, to beat up or scare the victim.  Defendant rejected this alternative to killing P. because "[t]hat's another chance of her coming back."  The only other matters Tosti and defendant

21

discussed were terms of payment, whether defendant's wife would go along with the plan, and how to cover Tosti's tracks so it would not lead back to him or defendant. This conversation lead to defendant's assertion that, instead of leaving P.'s body at the scene, he wanted "that bitch chopped up."  At the close of their conversation Tosti also gave defendant another opportunity to back out by saying, "[Y]ou tell me, 'Forget it,' and I walk out and I forget we even had a conversation . . ."  Defendant responded: "It's either you or I go find someone else."  Thus, in the entirety of Tosti's interaction with defendant there was not a scintilla of evidence that Tosti importuned, badgered, or cajoled defendant to induce him to solicit the murder of P.

Instead, the source of the alleged improper inducement was defendant's fellow inmate, Marvin Jackson.  Defendant contends that if his testimony were credited, the jury could have found Jackson's threat constituted the type of conduct that would induce a normally law-abiding citizen to commit the crime.[5]  He also notes that the fact that defendant had expressly threatened to kill P. if she reported the crime does not preclude giving the instruction because in California the availability of the entrapment defense does not require him to show absence of predisposition to commit the crime.  Instead, the test is objective, and focuses on the conduct of law enforcement, which is viewed in light of "the effect it would have on a normally law-abiding person situated in the circumstances of the case at hand.  Among the circumstances that may be relevant for this  purpose, for example, are the transactions preceding the offense, the suspect's response to the inducements of the officer, the gravity of the crime, and the difficulty of detecting instances of its commission.  [Citation.]" (Barraza, supra, 23 Cal.3d at p. 690.)  Yet, the more severe the crime is, the less likely it is that a normally law-abiding citizen could be badgered, cajoled, or importuned to commit it.  We question whether, even under threat of death at the hands of fellow inmates in prison, a normally law-abiding citizen would agree to arrange to kill an innocent victim in the hope of avoiding going to prison, rather than availing him or herself of legal alternatives to murder, such as seeking protective custody.  Nonetheless, we shall accept, for the sake of argument, defendant's premise that the threat he would be killed by gang affiliates in prison if he did not arrange to have P. killed is the type of conduct that would meet this objective standard.

_____

5. For the purpose of determining whether there is substantial evidence to support the Entrapment

instruction the court may not weigh it or assess its
credibility.  We therefore must disregard the
implausibility of the scenario, i.e., that Marvin
Jackson, a person who intended to order a hit on
defendant when he went to prison and had no interest in
defendant avoiding the penal consequences of his crime,
would prevail upon defendant to kill his victim and
thereby avoid the fate Jackson planned for him.

---

Assuming arguendo that a law-biding citizen might have
been induced to conspire and solicit to commit murder by
Jackson's threat, we find no error because there was no
substantial evidence to support the conclusion that
Marvin Jackson was acting as an agent for the police when
he made the threat.  Entrapment may not be committed by
a private citizen who is not acting for law enforcement,
because the defense is "'designed to prevent the
seduction of innocent people into criminality by
officers of the law.'"  (<u>People v. Gregg</u> (1970) 5 Cal.
App. 3d 502, 505.)  "[E]ntrapment is a defense not
because the accused is innocent, but in fulfillment of a
judicial policy to prevent police officers from
fostering crime.  To say that a non-police decoy may
commit entrapment ignores both the defendant's guilt and
the law's policy to deter illegal police conduct.  If the
defendant has committed a crime without the helping hand
of organized society, he should not escape conviction."
(<u>Id.</u> at p. 508.)

. . . To establish agency defendant would at least have
to show that Marvin Jackson was acting at the direction,
suggestion, or under the control of law enforcement when
he made the alleged threat. . . . The record is devoid of
such evidence.  Detective Tosti testified that during the
week of November 26, 2001, just days after defendant's
arrest, he received information from a confidential
informant that defendant was looking for someone to kill
the victim of the robbery and rape that defendant
allegedly committed.  Tosti testified that he had several
more contacts with the informant to assess the
credibility of the tip, and exchange information before
Tosti went undercover as "Kev," the hit man, to meet with
defendant.  Defendant rests his argument that the
foregoing is substantial evidence permitting an inference
that Marvin Jackson was acting as an agent of the police
at the time he made the alleged threat on two slim reeds:
First, he assumes that Marvin Jackson was the
confidential informant.  Although the court below refused
to compel disclosure of the identity of the confidential
informant, defendant suggests that the jury could have
drawn an inference that Marvin Jackson was the informant
based upon defendant's testimony that Marvin Jackson
regularly used the nickname M.J. and the fact that during

Tosti's tape-recorded meeting with defendant, Tosti asked
defendant how "M.J." was doing, and that in Peterson's
recorded call, she also referred to "M.J.," and Tosti
appeared to know to whom she was referring.   Second,
defendant argues that Detective Tosti's testimony that he
had two or three meetings with the informant to exchange
information before he met undercover with defendant was
sufficient to support the inference that Marvin Jackson
was acting as an agent for the police when he made the
threat that allegedly induced defendant to seek a hit man
to kill P.

. . .   No agency is shown "where law enforcement
officials merely accept information elicited by the
informant-inmate on his or her own initiative, with no
official promises, encouragement, or guidance." (In re
Neely (1993) 6 Cal. 4th 901, 915.)   Agency may be
inferred where, however, law enforcement officials direct
the informant to focus on a specific person, or instruct
the informant to obtain specific information.   (Ibid.)

. . .

The evidence upon which defendant relied failed to meet
the minimum threshold necessary to support an inference
of agency.   He presented nothing more than his suspicion
that Jackson was the confidential informant who provided
Tosti with the tip, and evidence that Detective Tosti had
several meetings with the informant after the initial
tip.   Assuming arguendo that the jury could infer that
Marvin Jackson was the confidential informant, the mere
possibility that Jackson provided information to the
police that defendant was looking for a hit man, or even
that he facilitated a meeting between defendant and
Tosti, does not support any inference that he was under
the direction or control of law enforcement when he made
a threat. . . .   Detective Tosti testified that he began
his investigation after the initial tip from the
informant who told Tosti defendant was looking for a hit
man.   Since defendant was already seeking a hit man, it
follows that any threat Jackson may have made to induce
defendant to look for a hit man would have preceded this
call.   The evidence of meetings with Tosti to verify the
credibility of the original tip, after it was made, does
not support any inference that the informant was working
as an agent of the police before he called with the tip.
Nor was there any evidence that, prior to receiving the
tip, Tosti had focused his investigation on defendant, or
advised or directed the informant to find out whether
defendant was planning to kill P.   There also was no
evidence of any agreement between the informant and
Tosti, or any other law enforcement official, whereby the
informant would solicit information from other inmates in
exchange for compensation or leniency of pending
charges.   In the absence of evidence the informant was

24

**United States District Court**
For the Northern District of California

acting under Tosti's direction, suggestion or control, Tosti's testimony that he had several meetings with the informant _after_ receiving the tip simply does not support a reasonable inference that the informant was under Tosti's direction and control before giving Tosti the tip when the alleged threat was made.

. . .

Defendant also suggests that, if his showing of agency was insufficient to support an instruction on entrapment, the deficiency in his evidence was caused by the court's refusal to compel disclosure of the confidential informant's identity, and denial of discovery requests regarding the relationship between Marvin Jackson and the police department and district attorney's office, which were predicated upon the assumption that Jackson was the informant.  Defendant, however, had other means to develop evidence concerning the relationship between the confidential informant and Detective Tosti.  For example, the court offered to hold a section 402 hearing with Tosti on the subject of agency and permit defendant to ask questions about the relationship between Tosti and the informant without disclosing the informant's name. Defense counsel rejected that suggestion, arguing that Tosti's testimony that he met with the informant several times was sufficient evidence of agency.  Nor did defendant use the opportunity on cross-examination to ask Tosti whether he had any agreement with the informant to target defendant and elicit information from him, when such an agreement was made, and what direction or control, if any, Tosti exerted over the informant's communications with defendant before the informant called Tosti with the tip.  In light of the availability of alternative means to develop evidence on the issue of agency without forcing disclosure of the informant's identity, we conclude that the court's ruling on his motion to compel disclosure of the identity of the confidential informant, and the related denial of discovery predicated on the assumption that Jackson was the informant, did not cause defendant's failure or inability to present evidence on the key issue of agency to support an instruction on entrapment.[8]

We conclude that the trial court did not err in refusing to instruct on entrapment because there was insufficient evidence to support a finding that Jackson, a private citizen, was acting as the agent of law enforcement when he induced defendant to commit the crime.

---

8. In any event, even if defendant had presented evidence that the informant had  provided information in the past, or that the police had generally requested the informant

United States District Court
For the Northern District of California

1  to provide any information he acquired in the future,
2  that would not be sufficient to submit the issue of
   agency to the jury, because it would not show agency at
   the time of the alleged inducement. (<u>United States v.</u>
3  <u>Busby</u>, (1986) 780 F.2d 804, 806-807.)

4  Respondent's Ex. 9 at 8-17.

5      B. Relevant Federal Law

6      As noted above, claimed instructional error must so infect the

7  trial that the defendant was deprived of the fair trial guaranteed

8  by the Fourteenth Amendment.  <u>Dunckhurst v. Deeds</u>, 859 F.2d 110,

9  114 (9th Cir. 1988).  It is true that a criminal defendant is

10  entitled to adequate instructions on the defense theory of the

11  case.  <u>Conde v. Henry</u>, 198 F.3d 734, 739 (9th Cir. 2000).  Failure

12  to instruct on the theory of defense violates due process if "'the

13  theory is legally sound and evidence in the case makes it

14  applicable.'"  <u>Clark v. Brown</u>, 450 F.3d 898, 904-05 (9th Cir.

15  2006).  However, a state trial court's refusal to give an

16  instruction does not alone raise a ground cognizable in a federal

17  habeas corpus proceedings.  <u>Dunckhurst</u>, 859 F.2d at 114.  Due

18  process does not require that an instruction be given unless the

19  evidence supports it.  <u>Hopper v. Evans</u>, 456 U.S. 605, 611 (1982);

20  <u>Menendez v. Terhune</u>, 422 F.3d 1012, 1029 (9th Cir. 2005).

21      C. Analysis

22      Although the state appellate court employed only state law in

23  its analysis of the denial of an entrapment instruction, that law

24  was not contrary to federal law.  Therefore, the appellate court's

25  denial of this claim was not contrary or an unreasonable

26  application of established federal law.

27      The appellate court undertook a thorough analysis of

28  Petitioner's arguments and the evidence he presented at trial.  The

26

United States District Court

For the Northern District of California

court's determination that Petitioner had presented insufficient evidence at trial to warrant an instruction on entrapment was not an unreasonable determination of the facts in light of the evidence presented.

The appellate court denied Petitioner's claim that the trial court's denial of his discovery motions deprived him of his Sixth Amendment right to present a defense because he might have discovered evidence that established that Jackson was an agent of the police.  The court reasoned that Petitioner could have obtained the evidence he sought in discovery through other means.  This was not contrary to or an unreasonable application of Supreme Court authority.

Furthermore, to obtain habeas relief, any constitutional error must have had a "substantial and injurious effect on the verdict." Brecht, 507 U.S. at 619.  There was a wealth of evidence pointing to the fact that Petitioner was not coerced into soliciting Tosti to murder P.  Petitioner threatened during the rape that he would kill P. if she reported it, Petitioner's statement to Tosti that P. had to die or there would be a "chance of her coming back," and his instruction to chop P. up after he killed her, incriminated Petitioner and revealed that he was not an ordinary citizen who had to be coerced into soliciting P.'s murder.  Furthermore, as noted by the appellate court, the theory that Petitioner would believe that Jackson wanted to protect him by advising him to have P. killed, so that he would not end up in prison where Jackson would order that he be murdered, would most likely be found to be implausible by the jury.  Finally, because agency must be shown at the time of the alleged inducement, the discovery of evidence that

27

**United States District Court**

For the Northern District of California

Jackson had been an informant for the police in the past or that
the police had generally requested he provide to them any
information he acquired in the future would have been insufficient
to submit the issue of agency to the jury.

Thus, the appellate court's determination of this claim was
not contrary to, or an unreasonable application of Supreme Court
precedent; nor did it result in a decision based on an unreasonable
determination of the facts in light of the evidence presented.

V. Jackson's Invocation of the Fifth Amendment

Petitioner argues that his right to due process and to present
a defense was violated because the trial court denied his request
to call Jackson and to instruct the jury that it could draw a
negative inference from Jackson's refusal to testify.  Citing <u>Crane
v. Kentucky</u>, 476 U.S. 683, 690 (1986) and <u>Taylor v. United States</u>,
484 U.S. 400, 4008-09 (1988), Petitioner argues that the appellate
court was unreasonable in its decision that Jackson had a valid
basis for asserting the Fifth Amendment privilege not to
incriminate himself and that he should not have been required to
invoke it before the jury.

A. Appellate Court Opinion

The appellate court addressed this claim, in relevant part, as
follows:

> Defendant attempted to call Jackson as a witness, but
> Jackson, in a hearing outside the presence of the jury,
> stated his intention to refuse to answer any questions,
> and invoked the Fifth Amendment privilege against
> self-incrimination.  Jackson's appointed counsel
> explained that his client had stated his intent to refuse
> to testify, and since that refusal exposed Jackson to
> contempt charges his counsel had advised him to invoke
> the Fifth Amendment privilege.  The court informed
> Jackson it did not believe that he had "any penal
> interest to be protected," and ordered him to answer

defense counsel's questions.  When Jackson again refused to answer, defendant argued that Jackson had no valid basis for invoking the privilege.  Defendant asked that Jackson be sworn and forced to invoke the privilege before the jury.  The court refused that request, and it deferred taking action on the contempt matter until after trial.

Defendant later renewed his request that the court either inform the jury that Jackson refused to testify, or allow defendant to call Jackson as a witness and force him to invoke the Fifth Amendment privilege.  His renewed request was predicated upon his assertion that facing contempt charges for refusing to testify was not a valid basis for asserting the Fifth Amendment privilege, and it therefore was permissible to compel Jackson to be sworn and invoke the privilege in front of the jury.  The district attorney argued that Jackson would face questions whether he "was making criminal threats of death" to defendant, and therefore he did have a valid basis for invoking the privilege against self -incrimination.  The court again refused defendant's request, and defendant now contends that this was prejudicial error.

It is well established that it is error to force a witness who validly invokes the Fifth Amendment privilege against self-incrimination to do so in front of the jury, because this procedure would encourage "inappropriate speculation on the part of jurors about the reasons for the invocation.  An adverse inference, damaging to the defense, may be drawn by jurors despite the possibility the assertion of the privilege may be based upon reasons unrelated to guilt." [Citations omitted].  Yet, if the witness "has no constitutional or statutory right to refuse to testify, a different analysis applies.  Juries are entitled to draw a negative inference when such a witness refuses to provide relevant testimony." (People v. Lopez, supra, at p. 1554.)

Defendant argues that Jackson had no valid basis for asserting the privilege based upon the possibility that he faced contempt charges, and that the court must have so found because it ordered Jackson to answer questions in the proceedings outside the presence of the jury.  He further contends that the court's ruling deprived him of the opportunity to invite the jury to draw a negative inference from Jackson's refusal to testify.  This, he argues, was prejudicial error because Jackson was the only person who could have corroborated defendant's testimony concerning the threat.  He reasons that the negative inference the jury might have drawn from his refusal to testify could have bolstered the credibility of defendant's testimony that Jackson had pressured him

29

into devising the plan to kill P.

We question defendant's premise that the trial court determined Jackson did not have a valid basis for asserting the privilege against self-incrimination. Defendant is correct that Jackson's counsel advanced only the argument that Jackson faced contempt charges based upon his stated intention to refuse to testify at all, and the court rejected this ground.  Nevertheless, later, when defendant reasserted his contention that the court should force Jackson to invoke the privilege before the jury, the district attorney pointed out that defendant had made an offer of proof that Jackson had threatened defendant with death if he did not arrange to kill P.  If true, this conduct could have furnished "'"a link in the chain of evidence needed to prosecute"'" him for the criminal offense of making criminal threats (Pen. Code, § 422) or other criminal liability.  (In re Marriage of Sachs (2002) 95 Cal. App. 4th 1144, 1151.) Thus, the court would have been within its discretion to conclude that, on this key issue, the assertion of the privilege would be valid, and that it would therefore be error to force Jackson to invoke it before the jury.

. . .

In any event, whether measured under the federal standard that defendant invokes, (Chapman v. California (1967) 3 86 U.S. 18, 20-21) or under People v. Watson, supra, 46 Cal.2d at p.836, any error was harmless.  Since Jackson clearly stated he would refuse to testify, the only consequence of the court's ruling was that defendant was deprived of the right to invite the jury to draw a negative inference from Jackson's refusal to testify. Defendant reasons that he could have relied upon this negative inference to bolster the credibility of his own testimony that Jackson did in fact threaten him.  Yet, such a threat would only have been relevant to the entrapment defense.  As we have held, defendant failed to present sufficient evidence to support an inference that Jackson was Tosti's agent when the alleged threat was made, and the court did not err in refusing to instruct on the entrapment defense.  Consequently, even if we accept the assertion that on the slim thread of this negative inference, the jury might have believed Jackson made the threat, there is no reasonable possibility that drawing a negative inference from Jackson's refusal to testify would have resulted in a more favorable outcome.

Respondent's Ex. 9 at 17-20.

B. Relevant Federal Authority

As noted above, a claim of a violation of Due Process and the

right to present a defense requires that the defendant be deprived of the fundamentally fair trial guaranteed by due process.  <u>Pulley</u>, 465 U.S. at 41.  The Self-Incrimination Clause of the Fifth Amendment provides that no person "shall be compelled in any criminal proceeding to be a witness against himself."  The Fifth Amendment privilege against self-incrimination applies to evidence which may directly support a criminal conviction, information which would furnish a link in the chain of evidence that could lead to a prosecution, and evidence which an individual reasonably believes could be used against him in a criminal prosecution.  <u>Maness v. Myers</u>, 419 U.S. 449, 461 (1975)(citing <u>Hoffman v. United States</u>, 341 U.S. 479, 485-86 (1951)).

C. Analysis

Petitioner contends that the appellate court's ruling on this claim was erroneous because Jackson and his attorney invoked the privilege on the improper basis that if Jackson refused to testify, he would be held in contempt of court; they did not claim that Jackson's assertion of the privilege was based on his fear of being prosecuted for threatening Petitioner.  Petitioner characterizes as speculative the appellate court's reliance on the prosecutor's statement that Petitioner had made an offer of proof that he intended to question Jackson about his threats to torture and kill Petitioner.

However, Petitioner does not dispute that he intended to question Jackson about the alleged threats he made to Petitioner. Furthermore, the fact that the prosecutor, rather than Jackson's attorney, pointed out this possibility is not determinative.

31

Therefore, the appellate court's finding that Jackson had a valid reason for invoking his Fifth Amendment privilege was not an unreasonable finding of fact based on the evidence before the state trial court.

Furthermore, the appellate court found that any potential error was harmless. If the court had required Jackson to invoke his Fifth Amendment privilege before the jury, it would have been relevant only to Petitioner's entrapment defense. However, as discussed above, Petitioner failed to present sufficient evidence to support a finding that Jackson was a police agent when the alleged threat was made. Therefore, the state court was not unreasonable in finding that any error would not have affected the jury's verdict.

Therefore, the state court's denial of this claim was not contrary to or an unreasonable application of established Supreme Court authority nor was it based upon an unreasonable finding of facts in light of the evidence presented to the trial court.

VI. Cumulative Effect of Court's Rulings

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may prejudice a defendant so much that his conviction must be overturned. Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003). However, where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation. Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

Because the Court finds no constitutional error in this case, there can be no cumulative error. Therefore, the state appellate

United States District Court
For the Northern District of California

court's denial of this claim was not contrary to or an unreasonable application of Supreme Court authority.

CONCLUSION

Based on the foregoing, Petitioner's petition for a writ of habeas corpus (Docket # 1) is DENIED and his motions for inquiry and to appoint counsel (Docket # 14) are DENIED as moot.  Judgment shall enter accordingly and the clerk shall close the file.  The parties shall bear their own costs.


IT IS SO ORDERED.


Dated:   9/2/08

_____
CLAUDIA WILKEN
United States District Judge

**United States District Court**
For the Northern District of California

33

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

1
2
3

JOHNSON et al,

4
                                                    Case Number: CV06-05539 CW
                    Plaintiff,
5
                                            **CERTIFICATE OF SERVICE**
6     v.
7   MALFI et al,
8
                    Defendant.
      _____/
9
10  I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court,
    Northern District of California.
11
12  That on September 2, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said
    copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said
13  envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located
    in the Clerk's office.
14
15
16  Amy  Haddix
    Deputy Attorney General
17  455 Golden Gate Avenue
    Suite 11000
18  San Francisco,  CA 94102-7004
19  Anthony E. Johnson
    California State Prison - Sacramento
20  Prisoner Id K-00750
    P.O. Box 290066
21  Represa,  CA 95671-0066
22  Dated: September 2, 2008
23                                       Richard W. Wieking, Clerk
                                         By: Sheilah Cahill, Deputy Clerk
24
25
26
27
28

United States District Court
For the Northern District of California